ELMER FREEMAN et al., Plaintiffs, *v.* CITY OF YONKERS et al., Defendants.

Supreme Court, Special Term, Westchester County, February 4, 1954.

948

*Paul L. Bleakley* for plaintiffs.

*J. Raymond Hannon, Corporation Counsel (John P. Phillips* of counsel), for City of Yonkers, defendant.

*John J. McQuade* for Alfred O. Hudson and another, defendants.

EAGER, J.   This is an action for injunctive relief and for a declaratory judgment.   The action attacks the validity of an ordinance of the City of Yonkers, adopted by the common council on March 10, 1953, amending the zoning ordinance of said city to change the zone classification of a single lot situate on Central Park Avenue in said city.   Such amending ordinance had the effect of placing the lot in a " C2 " (commercial) district, whereas formerly it was located, with the surrounding property, in a residential district.

By amendment to the complaint, attack is also made upon the new 1953 zoning ordinance of the City of Yonkers, and upon the map accompanying the same, insofar as such ordinance and map place the lot in question in a " C " (commercial) district.   This new 1953 ordinance and map accompanying same were adopted by the common council of the city on September 14, 1953, to supersede, effective on November 15, 1953, the former (1928) zoning ordinance and map, as amended.

The question before the court is whether the rezoning of the lot in question by the particular ordinances is invalid as arbitrary and discriminatory " spot zoning " legislation.   It appears that said lot is a quadrangular lot, with a rounded street corner, situate on the west corner of Central Park Avenue and Roxbury Drive.   It is about 150 feet wide front (on Central Park Avenue) and rear, and extends about 83.16 feet deep along Roxbury Drive and about 135 feet deep on the other (southwest) side.   This lot of land is owned by the defendants Hudson and Gold and will hereinafter be referred to as the subject lot.

Central Park Avenue is a main artery for vehicular travel, running in a northerly and southerly direction through the city of Yonkers, the southern terminus being the New York City line and the northern terminus being the town of Greenburgh line.   The distance from the New York City line to the town of Greenburgh line is between six and seven miles.   Roxbury Drive intersects and crosses Central Park Avenue a little over a mile south of the Greenburgh line.

Pursuant to the city building zone ordinance as it read prior to March 10, 1953, and the map accompanying the same, the

subject lot was in an " A-2 " zone. Such a zone was one primarily restricted to residential uses, including the use of premises for multiple dwellings and apartment houses, but with authorization also for churches, schools, libraries, museums, parks, playgrounds, clubs, community buildings, etc. The subject lot has always been in a residential district, but the " A-2 " zone embracing it prior to March 10, 1953, was among the least restricted of residential zones.

On or about January 13, 1953, the defendants, Hudson and Gold, presented a petition to the common council of the City of Yonkers requesting that the subject lot be changed from an " A-2 " to a " C-2 " district. This latter type of district was a commercial district for stores, theatres, office buildings, gasoline stations, restaurants with bars and like commercial uses. Provision was also made for use of premises in such a district for wholesale business and storage buildings, penal institutions, hospitals, printing plants, and certain manufacturing or industrial operations, with further provision for special extremely liberal uses upon express permission of the board of appeals.

According to custom, the common council referred the petition of Hudson and Gold for a change of the zoning classification of their said lot to the planning board of the City of Yonkers, and the planning board rendered a report declining to approve of the same upon the ground that " the zone change, if granted, would result in a ' spot ' zone change for one particular lot, to the detriment of adjacent properties similarly situated." At a public hearing held by the common council on this petition, after objections were made to the sufficiency of the notice, the petition was withdrawn, but on or about the 18th day of January, 1953, a new petition was presented for the same relief. This petition was likewise referred to the planning board and a report was rendered by such board disapproving the same upon the same grounds as stated in the prior report. The reports of the planning board have been offered in evidence, but decision as to whether they will be received has been reserved.

The common council held a public hearing on the second application on the 10th day of March, 1953, and the plaintiffs herein and others filed written protests with the common council and also protested at the public hearing. After the public hearing and on March 10, 1953, the common council, however, granted the request of the defendants Hudson and Gold, and adapted the said amendment to the zoning ordinance, changing the zone of the subject lot from " A-2 " to " C-2 ".

It further appears, that sometime in 1950, or early in 1951, the common council of the City of Yonkers directed the city manager to take the necessary steps to bring before the planning board of the City of Yonkers, the matter of a new zoning ordinance and zoning map for the entire city. Pursuant to this action of the common council, the planning board proceeded to engage planning consultants, and on or about the 20th day of February, 1952, the planning board approved a new proposed ordinance and map and recommended the same to the common council. It is pertinent to note that the proposed zoning of property along Central Park Avenue as shown upon the said map, from end to end, was slightly more restrictive than the zoning shown by the then existing map.

On July 21, 1953, the common council adopted a resolution which provided, in substance, that the new zoning ordinance proposed by the planning board and the accompanying map be amended and corrected to show all properties to be in the zone that said properties were rezoned to by action of the common council, provided such action had been taken between January 1, 1952, and July 7, 1953. The effect of this resolution would have been to place the subject lot in a " C-2 " zone, but there was no " C-2 " zone provided for in the proposed ordinance, and the new zoning ordinance and map, as finally adopted on September 14, 1953, placed the subject lot in a " C " zone.

By virtue of the provisions of the new zoning ordinance and map, the subject lot is now in the least restrictive of commercial districts. In fact, property zoned in this particular type of district may be devoted to virtually any use except heavy industry. On the other hand, the immediately surrounding properties are residentially zoned. Furthermore, it appears that the subject lot is situated at the fringe of a fine residential development known as Westchester Hills, which is located west of Central Park Avenue and on either side of Roxbury Drive and along various connecting roads, which include Roxbury Drive, Norwood Road, Croydon Road, Newport Road, Bedford Road and Regent Place. The development in this area commenced around 1933, and at present there are located therein approximately fifty-eight single-family dwellings. The area prior to March, 1953, was and now is zoned for single-family dwelling use.

The plaintiffs own a certain residence property situate in the said Westchester Hills development. Their residence, pur-

chased at a cost of $28,500 in 1952, is situate within 150 feet of the subject lot. The plaintiffs attack the validity of the commercial classification of the subject lot as " spot zoning ", and the court holds that they have the status and sufficient interest to maintain the action. The court finds that the value of their property and the values of all other residential property in the vicinity, including several residences situate on Bedford Place, Roxbury Drive and Newport Road, within 500 feet of the subject lot, are substantially depreciated by the change in zoning of the subject lot to permit its use for the purposes authorized in a " C " district in said city. The plaintiffs, therefore, have standing to maintain this action. (See *Buckley* v. *Fasbender,* 281 App. Div. 985, and *Marcus* v. *Village of Mamaroneck,* 283 N. Y. 325, 332–333.)

We have squarely presented here, therefore, the question of the validity of special legislation substantially lowering the zoning standards on a single lot to the detriment of neighboring property owners. The plaintiffs' claim, in effect, is that the legislation, that is, the amending ordinance of March 10, 1953, and that part of the new general zoning ordinance of September 14, 1953, as pertains to this lot, is invalid as " spot zoning ". The defendants, on the other hand, assert that the plaintiffs have failed to sustain the burden of showing the legislation to be beyond the legislative powers vested in the common council and that the court may not substitute its judgment for that of the local legislative body as to the wisdom of the change.

Much has been written on the subject, and innumerable cases from other States may be cited as in point, but counsel and this court have been unable to find any decision in this State where, at the instance of neighboring property owners, an ordinance has been voided upon the express ground that it constituted discriminatory and unlawful " spot zoning ". We have, however, a definition of " spot zoning " by our Court of Appeals, it having been said by such court, " Defined as the process of singling out a small parcel of land for a use classification totally different from that of the surrounding area, for the benefit of the owner of such property and to the detriment of other owners (citing cases) ' spot zoning ' is the very antithesis of planned zoning." (*Rodgers* v. *Village of Tarrytown,* 302 N. Y. 115, 123, 124.) We also have a decision of the Appellate Division of the Second Department holding, in effect, that a valid cause of action does exist in a proper case in behalf

of aggrieved property owners to declare invalid zoning amendments which constitute " spot zoning " and which were not enacted pursuant to a comprehensive plan for the general welfare of the community. (*Buckley* v. *Fasbender,* 281 App. Div. 985, *supra.*)

The majority opinion of the Court of Appeals (per FULD, J.) in the *Rodgers* case sets forth the law to be followed in this State in determining the validity of legislative " spot zoning." Under this decision, it is clear that, even though an ordinance or amendment (1) singles out and affects but one small plot, or (2) creates in the center of a large zone small areas or districts devoted to a different use, the appearance of a " comprehensive zoning plan " takes the curse of " spot zoning " from it. " Thus, the relevant inquiry is not whether the particular zoning under attack consists of areas fixed within larger areas of different use, but whether it was accomplished for the benefit of individual owners rather than pursuant to a comprehensive plan for the general welfare of the community ". (*Rodgers* v. *Village of Tarrytown, supra,* p. 124.)

Incidental benefit or detriment of the owners, either of the rezoned property or of neighborhood property, is generally of no direct consequence in determining the validity of legislation rezoning a parcel or a small block of land, provided, of course, the legislation does not amount to an unlawful confiscation of the affected realty by operating to prevent the use thereof for any reasonable purpose. Depreciation in value of neighborhood property and special hardship of the owners thereof are insufficient to invalidate a zoning amendment which promotes the general welfare. (*Hudson* v. *Town of Oyster Bay,* 248 App. Div. 737.) The ultimate question, therefore, is not whether or not there was benefit to the owners of the rezoned property and detriment to neighboring property owners, but whether or not the intent and effect of the legislation was to arbitrarily discriminate rather than to promote the public welfare. If such was the intent and effect of the legislation, the act is an arbitrary and improper exercise of legislative power, in that it offends against the due process and equal protection clauses of the Constitutions, and is not justified in the exercise of the police power. It is fundamental that valid zoning legislation must find its justification in the exercise of the police power in the interests of the public. (See *Matter of Concordia Collegiate Inst.* v. *Miller,* 301 N. Y. 189, 196.) Where particular zoning legislation does not promote health, safety,

morals or general welfare of the community, it may not be justified as a valid exercise of the police power and is invalid. Whether a zoning regulation is reasonable and conducive to the public health, safety, morals or general welfare so as to be a proper exercise of the police power is a question of fact. (*Hudson* v. *Town of Oyster Bay, supra.*)

Having set forth what is held to be the general principles of law governing the determination of this action, it is necessary now to decide whether the plaintiffs here have sustained the burden factually of establishing that the legislation bears no substantial relation to the public health, safety or welfare. The court holds that they have sustained such burden. In the first place, it is clear that the particular zoning change was sought and granted legislatively solely for the purpose of permitting the owners of the subject lot to establish a gasoline service station thereon. It was and is their contention that the size and location of their lot were such that it would be impractical to use it for any of the purposes authorized in a residential district, and therefore, they sought the change in zoning in order to use the premises for gas station purposes. Such fact of individual hardship did not, however, justify special legislation changing the zoning classification to permit a nonconforming use. While special hardship involuntarily inflicted on a property owner may justify a variance of a zoning ordinance by the board of appeals in a particular case (see General City Law, § 81), it is clear that individual hardship does not justify a discriminatory legislative act.

A zoning amendment, the purpose of which is to alleviate hardship of individual owners of particular premises, and which (as heretofore pointed out in this case) results to the detriment of neighboring owners, is of course, on the face of it, discriminatory. And it clearly appears that such discrimination as resulted from the legislation before the court was not merely the incidental result of legislation enacted with the intent to promote public health, safety or general welfare. Nor did the common council act in accordance with any comprehensive plan for the general welfare of the community. In fact, the common council rejected the considered recommendations of the planning board with respect to the zoning classification of the subject lot.

The plaintiffs have clearly proven that the establishment of liberal commercial uses along this part of Central Park Avenue is not in the interests of public welfare. The development in

recent years of property along the avenue, starting 100 feet north of Verona Avenue, which point is about one half of a mile south of the subject lot, and proceeding north to the Greenburgh line has been principally residential in character. A few neighborhood stores and local small business and service places are located along this section of the avenue, but nothing decidedly commercial in character has been established or allowed there in the last ten years. In fact, the proposed new zoning map approved by the planning board as of February 20, 1952, and recommended to the local common council provided for the elimination of all '' C '' zones from Central Park Avenue. Furthermore, the new general zoning ordinance and map finally adopted by the council on September 13, 1953, show a general tightening of zoning restrictions along the avenue. Under this ordinance, all of the area from the point 100 feet north of Verona Avenue to the city line is now zoned as residential and for incidental neighborhood businesses without provision for any '' C '' district other than this '' C '' zone of the single subject lot.

This northern section of Central Park Avenue has never been and is not now a business street. It is merely a busy street in the sense that it is a main artery for local and long-distance travel. And it appears that the travel thereon will be considerably eased in the future upon the completion of the portion of the New York State Thruway that is to traverse Yonkers. In any event, it is clear that, as a general proposition, a local legislative body does not have the power to rezone property along a main artery of travel, lot by lot at a time. Such would be piecemeal zoning, which is generally prohibited. Furthermore, it is generally held that restrictions should not be lowered on residential property merely because it abuts on a heavily travelled street. '' If residential districts can be changed merely on account of increased traffic, there would be no certainty or stability to zoning.'' (*Page* v. *City of Portland,* 178 Ore. 632, 640.)

The court also readily overrules the contention of defendants that the rezoning of the subject lot was justified in that the installation of a gasoline service station is a business service properly to be authorized on this particular street and in this particular area. In the first place, the very purport of the legislation here under consideration, permitting, as it does, the use of the premises for varied and extremely relaxed commercial purposes, such as, for instance, a machine shop,

plumbing shop, penal institution, printing plant, bowling alley, veterinary hospital, loft building, etc., prevents it from being justified on the theory that it was enacted solely to enable the installation of a needed gas station. In the second place, there was no reasonable ground for believing that there was or would be a need, within the reasonable future, for a gasoline service station upon the subject lot or in the vicinity thereof. Central Park Avenue and the adjoining area is more than amply provided with such stations. There are as many as thirty-three gasoline service stations along the six to seven miles of Central Park Avenue in the city of Yonkers, including one on each side of the Avenue about one-half mile north of the subject lot and one on each side of the Avenue about one-half mile south of the subject lot.

Since the preparing of this memorandum of decision, there has been handed down the opinion by Mr. Justice COYNE in *Greenberg* v. *City of New Rochelle* (206 Misc. 28). While such case is clearly distinguishable on the facts, the thorough and excellent discussion in the opinion therein of the law applicable where legislation is attacked as invalid " spot zoning " tends to confirm the undersigned in the determination here reached. It is clear that the validity of zoning legislation so attacked depends upon the special facts and circumstances present in the particular case. Mr. Justice COYNE reached the clearly justified conclusion upon the facts before him that the plaintiff did not sustain the burden of establishing that the particular zoning change was arbitrary, while, on the other hand, here, without any disagreement whatever as to the law applicable, this court has reached the determination that the plaintiffs have sustained the burden of factually establishing the zoning reclassification of the subject lot to be arbitrary and not a proper exercise of the police power. Specifically, this court finds that the amendment adopted March 10, 1953, changing the subject lot to a " C-2 " zoning classification was enacted with the intent to discriminate in favor of the owners thereof, and had such effect, and that it was not enacted pursuant to any plan to promote the public welfare. Furthermore, the court finds that such portions of the new zoning ordinance and map, adopted September 14, 1953, as place this same parcel in the " C " classification, were inserted and adopted in continuance and for the purpose of carrying out the arbitrary intent to discriminate and had such effect. It is obvious to the court upon the evidence, that the common council, in relaxing the

restrictions on the subject lot, did look no further than to confer a special benefit upon the owners thereof. Therefore, it is the opinion of the court that the plaintiffs are entitled to judgment as prayed for.

The reports of the planning board, upon the reference to it of the petitions of the defendant owners for the changing of the zone classification of their lot, having been marked as plaintiffs' Exhibits one and three for identification, are received in evidence. In the first place, these reports were pleaded in the complaint herein, copies thereof having been annexed thereto; and, by the answers herein and by virtue of admissions pursuant to the notices to admit served herein, they, in effect, stand admitted. Then, in any event, they were rendered pursuant to express statutory authority (see General City Law, §§ 27, 28, 30, 31), at the request of the common council. They were received by and were before the council at the time of the enactment of the amending ordinance, and in the opinion of the court, are relevant and material on the question of the intent of the legislative body and on the question whether the amendment was an arbitrary and discriminatory act. The reports are to be considered with the on-the-ground situation and the other relevant evidence in determining the issues in this action.

This memorandum shall stand as the decision of the court without the necessity of formal findings of fact and conclusions of law. Settle judgment on notice.