363 P.2d 607

CITY OF PHOENIX, a municipal corporation; Jack Williams, Mayor of the City of Phoenix; Val A. Cordova, Dr. Joseph M. Greer, G. Wesley Johnson, David P. Jones, Faith I. North and Clarence H. Shivvers, Councilmen of the City of Phoenix; John W. Beatty, Planning Director of the City of Phoenix, and F. C. Hurst, Building Inspector of the City of Phoenix, Appellants,

v.

Paul FEHLNER and Pola Fehlner, his wife; Jerry G. Kastner and Anita D. Kastner, his wife; Clarence L. Ashcraft; L. F. Mills and Thelma S. Mills, his wife; Byron Simonson and Meryl Simonson, his wife; Harry S. Gill and Naomi LaVerne, Gill, his wife; Howard E. Clements and Louella Clements, his wife; William M. Billings; Mary F. Mullen, a widow et al., Appellees.

No. 6648.

Supreme Court of Arizona.

En Banc.

July 13, 1961.

Rehearing Denied Oct. 10, 1961.

William C. Eliot, City Atty., Merle L. Hanson, Anis Mitchell and Charles A. Filler, Asst. City Attys., Phoenix, for appellants.

Gorodezky, Mitchell & Stuart, Phoenix, for appellees.

UDALL, Justice.

This case involves a challenge to the Zoning Ordinance of the City of Phoenix, as applied to the properties fronting on Thomas Road from 25th Place to 28th Street. The trial court held that the ordinance as applied to these properties was unconstitutional. The defendant City of Phoenix has appealed from that judgment.

On April 19, 1955, the City of Phoenix annexed an area containing approximately 4.9 square miles of which the parcels herein question were only a small fraction. After extensive study the planning and zoning department of the city prepared a tentative zoning map which it presented to the zoning board. The zoning board then held extensive public hearings and after some adjustments in the tentative plan based on the objections of property holders and information gathered at the hearings the zoning board submitted to the city council a comprehensive zoning plan for the entire area. The council held further hearings and made some additional changes, then enacted the plan as modified which is Ordinance G–133. The objections of the parties to this action were fully considered at the hearings held by the city council and its zoning agencies.

At the time of annexation the two and one-half block-long strip in issue was occupied primarily by residential uses although it was a somewhat mixed area. The map of existing uses offered in evidence shows that the north side of Thomas from 26th Street to 28th Street was entirely residential except for one small contractor's office and a Dairy Queen ice-cream stand. The other half block of the north side from 25th Place to 26th Street was vacant except for a small

office on the northwest corner of 26th and Thomas. On the south side of Thomas from 25th Place to 28th Street one half the property was devoted to residential uses while the remaining part was primarily devoted to orange groves or other undeveloped areas. Only one parcel of land had any commercial development.

A summary of existing uses indicates that it is mixed with residential clearly predominating over all other uses combined, followed by undeveloped and agricultural uses with only minor commercial use. The properties extending north and south from Thomas Road (those abutting the disputed lots) to a depth of several blocks are clearly residential in use except for some farming or vacant uses on the south.

Further complicating the factual situation at the time of annexation and the passage of Zoning Ordinance G–133 was the fact that Maricopa County had imposed on the disputed strip of two and one-half blocks along Thomas Road a hodgepodge of zoning which included some four or five different classifications which led the trial judge to say, among other things:

"I don't know of a case that I have examined that would permit such zoning as this. The courts have said time and time again this spot zoning cannot be supported.

\* \* \* \* \* \* \*

"I can't imagine the people sitting by and letting this happen."

It further appears that the Maricopa County Zoning ordinance covering this area at the time of annexation subsequently was declared void by this court for fundamental error in its attempted enactment. Hart v. Bayless Investment & Trading Co., 86 Ariz. 379, 346 P.2d 1101. Thus by decree of this court there was legally no existing ordinance covering this property at the time of annexation.

Confronted with the foregoing factual situation the City of Phoenix passed Zoning Ordinance G–133 which made classifications designed to harmonize this area with its master plan while at the same time conforming as nearly as possible, without being guilty of illegal spot zoning, to the existing use of the area. The strip in question was just part of a larger section of the newly annexed area which was zoned R–5. This classification permits the broadest range of uses of any of the residential classifications. In addition to ordinary residential uses, it permits, among others, some office buildings, drive-in theaters, hotels, motels, trailer courts, hospitals and similar charitable institutions. In fact, even though the area zoned R–5 was substantially developed at the time G–133 was passed, there were only three out of approximately thirty of the lots in question which were then being used commercially and they were granted nonconforming use permits.

It is significant to note that Thomas Road is one of the arterial streets which, according to the traffic map in evidence, carry substantially larger volumes of traffic than other streets lying between the arteries. The maps in evidence show that the entire northeast quadrant of the city is served by a grid of arteries generally about eight blocks apart and running both north-south and east-west. The zoning and existing use maps in evidence show that with very little exception the zoning and uses between arterial streets is limited to the more restrictive residential uses, principally R–1 and R–2. At the same time and with commendable consistency the zoning along the arterial streets is distributed in regular patterns between R–5, which is the least restrictive of the residential uses and different only in a limited degree from the more restrictive commercial uses, and the most restrictive type commercial uses, C–1 and C–2. Some of the properties fronting on arterial streets are, however, zoned for the more restrictive residential uses including R–1. There are only one or two instances where parcels are zoned either R–5 or C–1 or C–2 which do not front on an arterial street.

The pattern of distribution between R–5 and the commercial zones is substantially this: at and near the intersection of arterial streets on the arterial grid the properties are zoned for commercial use and between those intersections are located the R–5 zones. When the fact is borne in mind that R–5 is next to C–1 on a continuum of zoning classifications which includes ten different zones the sense of the zoning pattern becomes more clear even to persons not trained in the science of zoning who must rely on the cold appellate record for their information.

It is especially significant that the maps in evidence show that the zoning of the parcels in dispute is fully consistent with the patterns established throughout an infinitely larger area of the city. Even more significant is the fact that Thomas Road itself from Central Avenue to 56th Street ( a distance of fifty-six blocks) is zoned predominantly for R–5 use. Along this entire distance the only departure from R–5 zoning is for some small strips of R–1 (most restrictive residential use) and some (much less than half the properties fronting on Thomas Road) commercial zoning at the intersections of the arterial grid.

■ We think that even a superficial look at the exhibits in evidence completely rids the zoning here employed of any stain of possible spot zoning so frequently condemned by the courts. We cannot see that strip zoning as here employed is subject to condemnation. It follows a sensible pattern and to condemn it would be to condemn as well the application of commercial zoning to this area which is the alternative zoning which the complaining property holders

contend should be employed rather than R-5.

■ The problem of what constitutes an appropriate zone is primarily for the legislature. It is not the prerogative of the courts to substitute their judgment for that of the body which our system of government vests with primary responsibility for determining how best to serve public health, safety and welfare. The only role which the courts can properly play in the decision making once the properly constituted legislative body has spoken is to insure that the legislature has not exceeded the broad bounds set by the constitutions of the State and of the United States. As recently as 1954 the Supreme Court of the United States indicated in a unanimous decision that the limits within which the legislative judgment on public welfare must be left free are broad indeed. The court said:

"The concept of the public welfare is broad and inclusive. * * * The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for

us to reappraise them." Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 102–103, 99 L.Ed. 27, 38.

■ While the Supreme Court in the Berman case was dealing with the Due Process Clause of the Fifth Amendment which restricts federal action we think for the purposes here under consideration that the Due Process Clause of the Fourteenth Amendment is no more restrictive of state action when exercising its police power to promote the general welfare. See State ex rel. Saveland Park Holding Corp. v. Wieland, 269 Wis. 262, 69 N.W.2d 217.

The concept that a man owns his property from the center of the earth to the limits of the sky to use as suits his own fancy is not now and has not ever been entirely true. The doctrine of nuisance which has always been a restriction on land use is as ancient as the title to any land in this country. Of course in the beginning it dealt only with the more gross and obvious kinds of nuisance. But urban disease like disease of the body has been subjected to much more sophisticated examination in recent years. Now the germ theory of urban diseases such as slums, blight and others is well established. Where once the thought of an injection with a needle to prevent smallpox would have horrified even the most sophisticated in society we now accept it as a matter of course and may constitutionally compel every citizen to submit to

the treatment in the interest of the general welfare. To suggest otherwise would be laughable in our times. The fact that a similar development in the treatment of urban diseases has been much slower cannot in any way justify us in drawing constitutional limits which prevent the discovery and application of preventative medicine to this kind of public disease. Its very complexity suggests the need for a broad range within which to operate. If in our comparatively virgin state we can prevent the laying of the first brick of a ghastly slum like those which have ulcerated great urban centers elsewhere we should consider the cost of some experimentation a matter of small import indeed.

The persons who own property fronting on Thomas Road have no right to indiscriminately ignore the impact of their development on the properties adjacent to them. The zoning employed gives them great latitude to fix their own course of development but according to the lengthy testimony of those who are qualified in zoning the negative limits placed on that choice are necessary to prevent the creeping development of undesirable conditions which ultimately would cast a burden on all the property holders in the community. We think the limits set do not transcend the bounds of constitutionality.

There is a presumption that a zoning ordinance is valid. McCarthy v. City of Manhattan Beach, 41 Cal.2d 879, 264 P.2d 932; Standard Oil Co. v. City of Tallahassee, 5 Cir., 183 F.2d 410; 8 McQuillin, Municipal Corporations (3rd Ed.) § 25.295. The party objecting to the ordinance has the burden of showing the unconstitutionality of the ordinance. We said in City of Tucson v. Arizona Mortuary, 34 Ariz. 495, 506–507, 272 P. 923, 927:

"It therefore appears that the highest authority in the land has held that ordinances dividing cities into districts on the basis of whether they are residential or business and limiting the use of real estate within these various districts to certain purposes are to be sustained in principle, *it being necessary in order that they be declared unconstitutional that it affirmatively appear the restriction is clearly arbitrary and unreasonable, and has not any substantial relation to the public health, safety, morals, or general welfare.*" (Emphasis supplied.)

The rule set forth in that case is by no means novel. We said in Edwards v. State Board of Barber Examiners, 72 Ariz. 108, 112–113, 231 P.2d 450, 452:

" '* * * [W]here an enactment bears any reasonable relationship to the end sought the courts may not substitute their judgment for the judgment of the legislature.' And again stating antithetically: 'Hence the rule which is of universal acceptance that the

courts will acquiesce in the legislative determination of all matters of fact unless it is clearly erroneous, arbitrary and wholly unwarranted.'

"With these statements of the law we are in accord."

We are of the opinion that the objecting property holders completely failed to show that G–133 was clearly arbitrary and unreasonable and that it has no substantial relation to the public health, safety, morals, and general welfare. They nowhere contend that their properties are not reasonably usable for the purposes permitted under R–5 zoning. They offer, however, proof that their properties would be more valuable under commercial zoning, especially in view of the amount of traffic along Thomas, and that the natural development of the area was toward commercial use.

The mere loss of value has long been rejected as a basis for avoiding a zoning statute. City of Tucson v. Arizona Mortuary, supra. Nonconfiscatory financial loss where the property can be reasonably used for the purpose for which zoned is not, as a matter of law, sufficient to permit the courts to hold the ordinance unconstitutional.

"To sustain an attack upon the validity of the ordinance an aggrieved property owner must show that if the ordinance is enforced the consequent restrictions upon his property preclude its use for any purpose to which it is reasonably adapted."

Arverne Bay Const. Co. v. Thatcher, 278 N.Y. 222, 226, 15 N.E.2d 587, 589, 117 A.L. R. 1110. See also City of Tucson v. Arizona Mortuary, supra. The fact that the property is reasonably useable for the purposes for which zoned is sufficient to establish that this ordinance was not confiscatory. In addition, even if taken in the light most favorable to the property holders the evidence shows at most that the properties would be 50% less valuable for uses permitted under G–133 than for commercial use. On its face this is not a sufficient difference for the court to say that it is confiscatory and thus a taking without due process of law. So far as we can determine all that line of cases holding zoning ordinances to be confiscatory show a loss considerably in excess of that shown in this case, or that the property was unusable as zoned. Several cases have sustained ordinances where property devaluations were considerably greater than in this case. See, e. g., Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303; Brae Burn, Inc. v. City of Bloomfield Hills, 350 Mich. 425, 86 N.W.2d 166.

Even if the evidence shows conclusively that the natural development of this section would be toward commercial use it is not for the courts to say that zoning which prevents such development is unconstitutional.

We said in City of Tucson v. Arizona Mortuary, supra, 34 Ariz. at page 508, 272 P. at page 927:

"To hold that for zoning purposes a district could not be classified as residential merely because a few isolated business houses had been already established therein would practically prohibit the exercise of the right of zoning. As we have seen by the foregoing quotations from the Euclid case, neither the mere fact that the natural development of a district was toward industrial enterprise and that the normal and reasonably to be expected future use of certain property was for industry and trade purposes, nor the fact that property, if used for business purposes, would be of more value than if used for residential, will justify a court in finding unconstitutional an ordinance which checks or defeats such development or diverts it to another district."

Not only have the property holders failed to show affirmatively that the ordinance is unreasonable and arbitrary and that it bears no proper relation to the police power of the state but in addition it affirmatively appears in the record for the city that the ordinance complied as nearly as possible to the existing uses of the area. It further appears that the city's experts testified that commercial zoning in this area would create additional traffic hazards which clearly relate this ordinance to the police power over safety.

The most that can be said for the property holders' case is that it might be said upon the record that the reasonableness of the ordinance and its relationship to the police power are fairly debatable. The law is well settled that where there is any reasonable doubt as to the validity of the ordinance the court will not substitute its opinion for that of the legislative body. Price v. Schwafel, 92 Cal.App.2d 77, 206 P.2d 683; Willett & Crane, Inc. v. City of Palos Verdes Estates, 96 Cal.App.2d 757, 216 P.2d 85; Mallory v. Town of West Hartford, 138 Conn. 497, 86 A.2d 668.

The property holders did not rely entirely on their attempt to carry the burden of showing affirmatively the unconstitutionality of G–133. They contend that in this case G–133 constitutes a change of an existing zoning ordinance and that therefore the burden of proof shifts to the city to prove affirmatively that there has been a change of circumstances justifying such a change. Whatever the rule may be which applies to change or amendment of existing ordinances that rule can have no application in this case where, as we have already noted, there was no lawful zoning ordinance in effect as to this property at the time of its annexation and the passage of G–133.

In light of our determination of the issues in this case we hold that the trial court err-

ed in holding that G–133 as applied to these properties was unconstitutional. The judgment of the trial court is therefore reversed.

LOCKWOOD, J., and PORTER MURRY, Superior Court Judge, concurring.

BERNSTEIN, V. C. J., having announced his disqualification, the Honorable PORTER MURRY, Judge of Superior Court, Greenlee County, was called to sit in his stead.

STRUCKMEYER, Chief Justice (dissenting).

This is a class action brought by some of the owners of those lots abutting on Thomas Road between Twenty-fifth Place and Twenty-eighth Street, a distance of about three ordinary city blocks. None of the evidence disputed the fact that all of the frontage in question is eminently suitable for commercial purposes.

Thomas Road is the second busiest east and west arterial within the city, having at about the time of the city's annexation an average traffic flow at Twenty-fourth Street of 17,260 motor vehicles daily. Approximately 65% of the frontage between Twenty-fifth Place and Twenty-eighth Street was zoned commercial on April 19, 1955, the date of the city's annexation. Commencing on the south side of Thomas Road 1,600 feet west of the area in question and on the north side about 900 feet west, all of the abutting property was zoned commercial. Commencing at Twenty-eighth Street and running approximately 2,800 feet east the abutting property was zoned commercial. Hence, squarely in the middle of an area approximately 6,400 feet in length zoned commercial is an island which while eminently suitable for commercial development has been re-zoned by the city to R–5, residential.

Such a practice is commonly known as "spot zoning".

"A zoning ordinance or amendment of the present type creating a small zone of inconsistent use within a larger zone is commonly designated as 'spot zoning.'" Penning v. Owens, 340 Mich. 355, 65 N.W.2d 831, 836.

Spot zoning is almost universally held to be arbitrary, discriminatory and invalid. Kissinger v. City of Los Angeles, 161 Cal. App.2d 454, 327 P.2d 10; Rockhill v. Chesterfield Township, 23 N.J. 117, 128 A.2d 473; State ex rel. Miller v. Cain, 40 Wash. 2d 216, 242 P.2d 505; State ex rel. Scandrett v. Nelson, 240 Wis. 438, 3 N.W.2d 765. It tends to sabotage the fundamental purpose of the zoning statutes requiring the division of land into districts "for trade, industrial, residential or other purposes". A.R.S. § 9–461.

"A classification in a municipal zoning ordinance *must be based on natural*

*distinguishing characteristics* and must bear a reasonable relation to the subject of legislation, must be founded upon distinctions reasonable in principle and have a just relation to the subject sought to be accomplished, and *must be based upon substantial difference between the situation of such class or classes of other individuals or classes to which it does not apply.*" (Emphasis supplied.) Rawlins v. Braswell, 191 Tenn. 285, 231 S.W.2d 1021, 1022.

There are no natural distinguishing characteristics or substantial differences between the "island" properties of appellees and the adjacent properties which were zoned commercial. Therefore, the difference in classification of properties of a similar nature on Thomas Road is manifestly without a reasonable basis. The majority wholly ignore this fundamental concept and for this reason alone the trial court should be affirmed in its judgment.

Second, it is contended by appellees and supported by the facts that here is a case involving re-zoning. If so there is thus brought into application different principles of law than involved in original zoning. It is the rule that to justify re-zoning there must be a substantial change in conditions in order that there be a valid exercise of the police power. Charnofree Corp. v. City of Miami Beach, Fla.1954, 76 So.2d 665; Zilien v. City of Chicago, 415 Ill. 488, 114 N.E.2d 717; Trenton Development Co. v. Village of Trenton, 345 Mich. 353, 75 N. W.2d 814; Page v. City of Portland, 178 Or. 632, 165 P.2d 280. New and additional facts must appear or other considerations materially affecting the merits must be shown to have intervened since the original zoning was adopted. Strain v. Mims, 123 Conn. 275, 193 A. 754.

The county established commercial zoning on the majority of the lots in the area under consideration. The city zoning ordinance of December 27, 1955 changed the prior zoning. The majority dismiss the appellees' argument that this is re-zoning by citing Hart v. Bayless Investment & Trading Co., 86 Ariz. 379, 346 P.2d 1101 to the effect that the Maricopa County Zoning Ordinance covering this area at the time of annexation was, some two years later declared void due to fundamental error in its enactment and conclude that there was no legal existing ordinance covering this property at the time of the annexation. Property owners in this area had relied upon the existing county zoning. Property had been bought and sold and developments planned in reliance on the ordinance.

The operative fact of the county ordinance should not be denied, since, for all practical purposes, it was treated as valid many years before the city's annexation.

"Although it was formerly held that an unconstitutional statute is a nullity ab initio (see Norton v. Shelby County,

118 U.S. 425, 442, 6 S.Ct. 1121, 30 L.Ed. 178, and Chicago, Indianapolis & Louisville Railway Co. v. Hackett, 228 U.S. 559, 566, 33 S.Ct. 581, 57 L.Ed. 966), more lately it has been recognized that the consequences of action taken or restricted in obedience to the requirements of a statute which subsequently is declared unconstitutional are to be appraised and adjudged in the light of the compulsion exerted by the statute prior to its determined invalidity. In Chicot County Drainage District v. Baxter State Bank et al., 308 U.S. 371, page 374, 60 S.Ct. 317, 318, 84 L.Ed. 329, Mr. Chief Justice Hughes, speaking for the Supreme Court, after specifically referring to the Norton and Hackett cases cited supra, said, 'It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual annd corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination.' * * " J. A. Dougherty's Sons v. Commissioner of Internal Rev., 3 Cir., 121 F.2d 700, 702.

The majority's conclusion gives too technical an application to our opinion in the Hart case, supra. People's rights were determined under the zoning and its provisions were scrupulously enforced.

In my opinion, the majority err for another reason in this conclusion. At the time of the annexation all the city's ordinances became effective in the area in question. Mr. John W. Beatty, Planning Director for the City of Phoenix, testified that Phoenix Municipal Ordinance, Section 104, paragraph C, subsection 1, relating to zoning of newly annexed territory provided:

"Areas, when annexed to the City of Phoenix, shall, until officially zoned by the City Council of the City of Phoenix, be considered to be zoned as shown on the *Official Zoning Map* of the Maricopa County Planning and Zoning Commission." (Emphasis added.)

The City of Phoenix Ordinance 104 does not use the words "valid zoning ordinance" nor does it refer to any existing county "ordinance". It states that the newly annexed property will be considered to be

zoned as shown on the county's official zoning map. At the time of annexation the county zoning map, introduced into evidence, showed commercial zoning of a majority of properties in this area and it so remained for over eight months after the city's annexation—that is from April through December 1955.

Property owners are entitled to rely on zoning with the knowledge that it will be more or less permanent and subject to change only to meet genuine changes in conditions. Northwest Merchants Terminal v. O'Rourke, 191 Md. 171, 60 A.2d 743. They are entitled, in conducting their private investments, to the benefit of the rule that re-zoning is not a valid exercise of the police power unless there is a showing of "substantial change of conditions" in the character of the area changed.

As a consequence of their peculiar view of the laws of the case the majority have applied the rule that there is a presumption of validity applicable to zoning ordinances and that the party objecting to the ordinance has the burden of showing the unconstitutionality thereof. The presumption of validity does not apply with as great a force in re-zoning. Wakefield v. Kraft, 202 Md. 136, 96 A.2d 27; Northwest Merchants Terminal v. O'Rourke, 191 Md. 171, 60 A.2d 743, 752. In the latter case it was held that the presumption of validity:

"applies to rezoning as well as to original zoning * * * but not with the same weight. Indeed, it creates a counter-presumption that zones are 'well planned and arranged' and are to be 'more or less permanent', subject to change only to meet genuine change in conditions."

In the present case the presumption of validity should be given no weight whatsoever. There is not a scintilla of evidence to show any change of condition from a commercial use. To the contrary the evidence on behalf of appellees establishes that the property fronting Thomas Road in this area was initially farming and residential but that progressively over the past years its residential uses have been abandoned and according to appellees "is not suitable for residence anymore". Indeed this testimony alone is sufficient to discharge any presumption of validity since it is the unbroken holding of the Court that presumptions retire in the face of any positive proof.

"* * * 'Presumptions may be looked on as the bats of the law, flitting in the twilight, but disappearing in the sunshine of actual facts.' * * *" Seiler v. Whiting, 52 Ariz. 542, 84 P. 2d 452, 455

I am of the opinion that the judgment of the court below should be affirmed for the reason that the appellant City of Phoenix failed to establish a change of conditions reasonably requiring re-zoning.

Third, the court below in its memorandum opinion found that no reasonable basis of health, safety or public welfare required the limitation and restriction of the appellees' property to a residential classification. The question then is whether this conclusion of the trial court is justified. Evidence in an attempt to substantiate the rezoning was given by one Hugh R. Pomeroy, an alleged expert for the city on social planning. He examined various maps, primarily of the city zoning and then drove over the entire metropolitan area on most of the major thoroughfares rather generally criss-crossing in and around the city.[1] The essence of his testimony was his personal opinion that the "clustered or shopping center type development" is superior to what is called "strip" commercial development along the arterial roads. His reason for this opinion was, as he stated:

"Modern business development insofar as it is given an opportunity to do so, under zoning, tends to go to designated area development rather than marginal strip development and modern planning undertakes to facilitate the operation of economics through the activities of private enterprise in that way."

Since no factual matters were offered to support his private ultimate opinion and none could be developed from him on cross-examination, the testimony is no more than a personal conclusion of the way things ought to be![2] The witness's supporting testimony can be paraphrased more forthrightly thus:

"Modern business development insofar as it is compelled to do so, under zoning, must go to designated area development, etc."

Some testimony developed that there was ample strip zoning along Thomas Road between Central Avenue and Fifty-sixth Street. That other property had been zoned commercial, sufficient to satisfy the needs of the community in the expert's

---

1. The City of Phoenix was orginally laid out with reference to the Salt River Base & Meridian. All the land was homesteaded, the principal roads being established on the mile section lines. As the city grew and housing replaced farming, commercial establishments, retail trade outlets, developed along the main arterials. Thomas Road is a main arterial being two miles north of Washington Street, the principal east-west highway.

2. As a further example of the basis for his opinion, and perhaps, of his less specious testimony:

"As we get into the areas that are more open, including those most recently annexed from the unincorporated territory, the county, we see the reflection of the opportunity that the City had to zone more in accord with the modern practice of business development, which is a reflection of the manner in which private enterprise serves the demand for business property in terms of what might be called the dynamics of the market as to the area of business buildings in relation to automobile parking and automobile access areas."

opinion does not justify the denial of proper zoning for appellees' property to the use for which it is best suited. Moreover, the facts belie the inference that the city's action was not arbitrary. Within seven months after the re-zoning of appellees' property the city commission re-zoned on Thomas Road to commercial 112 acres, 12 acres on April 24th, 1956 near Thirty-second Street, 60 acres on July 31st, 1956 between Thirty-sixth Street and Fortieth Street and 40 acres on August 7th, 1956 near Forty-fourth Street.

The majority in part base their decision on the testimony that commercial zoning in this area would create additional traffic hazards "which clearly relate this ordinance to the police power over safety". In this respect the testimony by Mr. John W. Beatty, City Planning Director was:

"By the establishment of strip zoning—strip commercial activity along these arterials with the required curb cuts and driveways necessary to permit people to get into the places of business, and get out of the places of business, each one of these curb cuts adds a conflict as far as traffic movement is concerned. These various points of conflict thereby lessen the traffic-carrying capacity or they decrease the traffic-carrying capacity of this arterial, which is one of its main functions, to carry people from here to here. It creates points of conflict which in effect are hazardous over-all."

As the trial judge pointed out, this same line of reasoning is applicable to both strip and shopping center areas. Each motor vehicle whenever it seeks ingress or egress onto a public highway must add a point of conflict, "hazardous over-all." But since it is the only ostensibly valid reason assigned for denying commercial zoning to appellees, it should be examined in more detail.

Article II, Section 17 of the Arizona Constitution, A.R.S., provides that "no private property shall be taken or damaged for public or private use without just compensation." Others with like properties are permitted commercial development in this area irrespective of traffic conditions. A classification which deprives appellees of a substantial value of their property by depriving them of a similar use of the public highway should be held to be a confiscation for the benefit of the public and the other private property owners.

In addition, I am of the opinion to deny appellees the right to fully use the property on such a flimsy pretext violates Article II, Section 13, of the Constitution providing that:

"No law shall be enacted granting to any citizen, class of citizens, or corpo-

ration other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

The right to use the public highways for ingress and egress should be available upon the same terms and conditions equally to all property owners having like property characteristics. Changes in zoning regulations must be uniform and not discriminatory among property owners. Carole Highlands Citizens Ass'n v. Board of County Com'rs of Prince George's County, 222 Md. 44, 158 A.2d 663; Freeman v. City of Yonkers, 205 Misc. 947, 129 N.Y.S.2d 703; Callanan Road Imp. Co. v. Town of Newburgh, 6 Misc.2d 1071, 167 N.Y.S.2d 780, affirmed 5 A.D.2d 1003, 173 N.Y.S.2d 780, and they are invalid where establishing special privileges. Mathis v. Hannan, Ky. 1957, 306 S.W.2d 278; Edgewood Civic Club v. Blaisdell, 95 N.H. 244, 61 A.2d 517.

The validity of this zoning based upon the social planner's concept of the way things ought to be can find no justification in the public health, safety and general welfare if constitutional principles are adhered to.

The judgment of the court below should be affirmed

JENNINGS, J., concurs in the foregoing dissent.