440 P.2d 44

Peter RUBI, Dennis Weaver and Thomas Jay, all duly elected Supervisors of the Board of Supervisors in and for the County of Pima, State of Arizona, William C. Speed and Peggy T. Speed, husband and wife, Appellants,

v.

49'ER COUNTRY CLUB ESTATES, INC., an Arizona corporation, and Magna Investment & Development Co., a foreign corporation, Appellees.

No. 2 CA–CIV 449.

Court of Appeals of Arizona.

April 23, 1968.

Rehearing Denied May 27, 1968.

Review Denied June 25, 1968.

Robert Hillock, Tucson, for appellant, Board of Supervisors.

Johnson, Darrow, D'Antonio, Hayes & Morales, by, Raymond F. Hayes, Tucson, for appellants, Speed.

Robertson & Fickett, by, Burton J. Kinerk, Tucson, for appellees.

KRUCKER, Judge.

The appellees, plaintiffs below, own property zoned CR–1 (one acre residential) in a subdivision known as the 49'er Country Club Estates, located in Pima County. The property obtained this zoning when the original subdivision plot was approved by the Board of Supervisors of Pima County prior to the adoption in April, 1963, of the Agua Caliente-Sabino Creek plan. (The zoning ordinance herein involved.)

I. The complaint alleged, *inter alia*:
"* * * that in failing to grant the rezoning requested by the plaintiff and thus restricting the plaintiff's use of the parcels herein specified, such denial must bear a reasonable relation to the public health, safety, peace, order, welfare or morals in regard to that property which was subject to the application for rezoning; that in denying the plaintiff's application for rezoning and thus restricting its use of the parcels, the

In February, 1966, the plaintiffs applied for a rezoning of certain parcels within the estates to CR–5 which would allow construction of denser housing such as the townhouses contemplated by them. The County Planning and Zoning Commission, after a hearing, recommended to the Board of Supervisors approval of the rezoning application from CR–1 to CR–5, subject to certain conditions. The Board of Supervisors conducted full and complete hearings on the application and denied it by a vote of 2 to 1. Thereupon the plaintiffs filed suit in superior court, Pima County, seeking judicial relief by way of declaratory judgment and mandamus on the grounds that the Board of Supervisors had acted arbitrarily and capriciously in denying the application. Certain property owners in the area were granted leave to intervene in the action.

The case was tried to the court sitting without a jury and the court resolved all issues in favor of the plaintiffs, declared that they were entitled to use the subject property for the building of townhouses, a permitted use within CR–5 zoning, and directed that a writ of mandamus issue to the Board of Supervisors commanding them to grant the request for rezoning from CR–1 to CR–5. The Board of Supervisors and the intervenors Speed filed their respective notices of appeal from this judgment, but only the intervenors have filed briefs in this court.

The appeal challenges the trial court's invalidation of the Board's action in denying the rezoning application.

Although the complaint is lacking in clarity, we construe it as an attack on the constitutionality of the zoning ordinance.[1]

Board of Supervisors acted in a manner which bore no reasonable relation to the public's health, safety, peace, order, welfare or morals in regard to the specified parcels.

VI

"That the action of the Board of Supervisors in denying the plaintiff's application was an abuse of discretion and that such action was so unreasonable, arbitrary and capricious that reasonable men should not differ and that

The general purpose of zoning laws is to promote the general welfare by providing a more stable environment for the orderly development of a community, i. e., a means of strengthening the character of a particular area in terms of its use. Weitz v. Davis, 102 Ariz. 40, 424 P.2d 168, 171 (1967); McNaughton v. Boeing, 68 Wash.2d 659, 414 P.2d 778 (1966). They find their justification in the police power, exerted in the interest of the public. 1 Yokley, Zoning Law and Practice (3d ed.) § 2-1, at 24.

The principles fixing the validity or invalidity of zoning ordinances have often been stated; however, it is the application of these principles to a given state of facts which creates the difficulty. The Board of Supervisors, in adopting the Agua Caliente-Sabino Creek zoning plan, acted in a legislative capacity, Hart v. Bayless Investment & Trading Company, 86 Ariz. 379, 389, 346 P.2d 1101 (1959), cloaking the ordinance with a presumption of validity. City of Phoenix v. Fehlner, 90 Ariz. 13, 18, 363 P.2d 607 (1961); Mueller v. City of Phoenix, 102 Ariz. 575, 435 P.2d 472, 478 (1967).

The plaintiffs who assailed this ordinance had the burden of overcoming this presumption. City of Phoenix v. Fehlner, supra; Rathkopf, Law of Zoning and Planning (2d ed.) § 18, at 127. In order to have the zoning ordinance declared unconstitutional, they were required to affirmatively show that the restriction was "clearly arbitrary and unreasonable," without "any substantial relation to the public health, safety, morals, or general welfare." City of Tucson v. Arizona Mortuary, 34 Ariz. 495, 272 P. 923 (1928).

The term "reasonableness" is not susceptible of concrete definition but rather depends upon the facts and circumstances of the particular case. 1 Yokley, Zoning

Law and Practice (3d ed.) § 2-14, at 57. It has been held that the exercise of the police power under an ordinance may be proper in a general sense but may be unreasonable and confiscatory as applied to a particular parcel of property. See, Horwitz v. Town of Waterford, 151 Conn. 320, 197 A.2d 636 (1964); White v. City of Twin Falls, 81 Idaho 176, 338 P.2d 778 (1959); Board of Zoning Appeals of New Albany v. Koehler, 244 Ind. 504, 194 N.E.2d 49 (1963); Golden v. City of St. Louis Park, 266 Minn. 46, 122 N.W.2d 570 (1963); Huttig v. City of Richmond Heights, 372 S.W.2d 833 (Mo.1963); Francis v. City and County of Denver, 418 P.2d 45 (Colo. 1966).

Of critical importance here is the limited role of the judiciary in zoning cases. Courts are ill equipped to sit as super-zoning commissions. Therefore, where the reasonableness of a zoning ordinance is fairly debatable, it must be upheld. City of Phoenix v. Fehlner, supra; Huneke v. Glaspy, 155 Colo. 593, 396 P.2d 453 (1964); Meginnis v. Trustees of Shepherd and Enoch Pratt Hospital, 246 Md. 704, 299 A.2d 417 (1967); Wilkins v. City of San Bernardino, 162 P. 2d 711 (Cal.1945); Zahn v. Board of Public Works, 274 U.S. 325, 47 S.Ct. 594, 71 L. Ed. 1074 (1927); State ex rel. Manchester Improvement Company v. City of Winchester, 400 S.W.2d 47 (Mo.1966); 101 C.J.S. Zoning § 68. The following comment in Robinson v. City of Bloomfield Hills, 350 Mich. 425, 86 N.W.2d 166 (1957) reveals the judicial function:

"With the wisdom or lack of wisdom of the determination we are not concerned. The people of the community, through their appropriate legislative body, and not the courts, govern its growth and its life. Let us state the proposition as clearly as may be: It is not our function to approve the ordinance before us as to wisdom or desirability. For alleged

the plaintiff's application for rezoning the said parcel should be granted.

VII

"That said parcels cannot be properly used for residential purposes * * *

and that in denying the plaintiff's application, the act of the Board of Supervisors constituted a needless injury to the plaintiffs without a compensating benefit to the public."

abuses involving such factors the remedy is the ballot box, not the courts. * * *" 86 N.W.2d, at 169.

The trial court found that the ordinance was unreasonable and bore no proper relation to the police power of the state. Its findings and conclusions as to the reasonableness of the ordinance, however, are not binding on this court if the record shows the question is "debatable." Hamer v. Town of Ross, 59 Cal.2d 776, 31 Cal.Rptr. 335, 382 P.2d 375 (1963); Skyline Materials, Inc. v. City of Belmont, 198 Cal.App. 2d 449, 18 Cal.Rptr. 95 (1962). As stated in Lockard v. City of Los Angeles, 33 Cal.2d 453, 202 P.2d 38 (1949):

"The appellate courts look beyond such determinations and consider in some detail the basic physical facts appearing in the record, such as the character of the property of the objecting parties, the nature of the surrounding territory, the use to which each has been put, recent trends of development, etc., to ascertain whether the reasonableness of the ordinance is fairly debatable. [Citations omitted] Similarly, findings which relate to matters of opinion and judgment, such as that property is 'suitable only' for certain purposes, are not controlling. [Citations omitted] As we have seen, matters of this type lie within the discretion of the zoning authorities, and their action will be upheld if the question is fairly debatable." 202 P.2d at 43.

However, the fact that there may be a difference of opinion among witnesses does not mandate a judicial finding that the reasonableness of the ordinance is debatable. Myers v. City of Elmhurst, 12 Ill.2d 537, 147 N.E.2d 300 (1958); Huttig v. Richmond Heights, supra; City of Tulsa v. Swanson, 366 P.2d 629 (Okl.1961). Rather, the court must determine from all the facts whether difference of opinion are reasonable and justifiable. Mutz v. Village of Villa Park, 83 Ill.App.2d 1, 226 N.E.2d 644 (1967).

The mere fact the property would be substantially more valuable if another use were permitted is not in itself sufficient reason to invalidate an existing zoning ordinance. City of Phoenix v. Fehlner, supra; Reeve v. Village of Glenview, 29 Ill.2d 611, 195 N.E.2d 188 (1963); City and County of Denver v. American Oil Co., 150 Colo. 341, 374 P.2d 357 (1962); Maywood Proviso State Bank v. Village of Berkeley, 55 Ill. App.2d 84, 204 N.E.2d 144 (1965). Although mere loss of value is not considered controlling, when it is shown that no reasonable basis of public welfare requires the restriction and resulting loss, some courts have taken the view that the presumption of validity is dissipated. See LaSalle National Bank of Chicago v. Cook County, 12 Ill.2d 40, 145 N.E.2d 65 (1957); First National Bank and Trust Co. of Evanston v. County of Cook, 15 Ill.2d 26, 153 N.E.2d 545 (1958); Horwitz v. Town of Waterford, 151 Conn. 320, 197 A.2d 636 (1964); Long v. City of Highland Park, 329 Mich. 146, 45 N.W.2d 10 (1950); Huttig v. City of Richmond Heights, 372 S.W.2d 833 (Mo. 1963).

In City of Tucson v. Arizona Mortuary, supra, our Supreme Court has indicated when judicial intervention may be proper:

"Doubtless, if the value of the property rights destroyed is so great, as compared with the benefit done, that it clearly appears the ordinance is arbitrary and unreasonable, the courts will interfere, but if there can be any reasonable argument on the question the legislative will must prevail." 34 Ariz., at 512–513, 272 P.2d at 929.

Our Supreme Court in City of Phoenix v. Fehlner, supra, has laid down the following test, quoting from the landmark case of Arverne Bay Construction Company v. Thatcher, 278 N.Y. 222, 15 N.E. 2d 587, 589, 117 A.L.R. 1110 (1938):

"To sustain an attack upon the validity of the ordinance an aggrieved property owner must show that if the ordinance is enforced the consequent restrictions upon his property preclude its use for any purpose to which it is reasonably adapted." 90 Ariz., at 19, 363 P.2d at 611.

The Court, in the *Fehlner* case, pointed out that a fifty percent depreciation in value resulting from the rezoning ordinance was not "a sufficient difference for the court to say that it is confiscatory and thus a taking without due process of law." (90 Ariz., at 19, 363 P.2d at 611)

The subject property is located just south of the intersection of Tanque Verde Road and Soldier Trail, a portion thereof lying east of Soldier Trail and the other portion lying west thereof. The plan indicates that both Tanque Verde Road and Soldier Trail were contemplated as major streets having a 150 ft. right-of-way. The subdivision within which the subject parcels are located consists of some 306 residential lots surrounding the 49'er Country Club golf course. It is located in the southeast portion of the 33-square-mile area encompassed by the Agua Caliente-Sabino Creek Plan. The plaintiffs had expended a half-million dollars in developing the golf course, and membership in the country club had quadrupled within the period from 1962 to 1966. Approximately 80 of the lots in the subdivision had been sold at the time of trial but only about 28 had been built upon. The general nature of the area surrounding the 49'er subdivision consisted of large, expensive homes or small ranches constructed on substantial parcels of land ranging in size from 5½ acres to 110 acres.

Although the original intention of the planning and zoning staff was to include multi-family developments adjacent to future commercial areas, the Agua Caliente-Sabino Creek Plan, as finally adopted by the Board of Supervisors, did not include such areas. It was agreed that such areas would be developed, if at all, upon application by individual land owners, each application to be considered on its merits. The entire area included in the plan, except for existing business uses, was zoned either suburban ranch (SR–.25 residences per acre) or CR–1 (1 residence per acre).

Within the three-year period, from the time of passage of the zoning law ordinance in 1963, until 1966, the population in the area had not appreciably increased: from approximately 1200 to approximately 1450 persons. Subdivision deed restrictions limiting construction to one residence per acre in 49'er Country Club Estates did not apply to the property as to which rezoning was sought. The plaintiffs agreed to build only townhouses on the property if the CR–5 zoning was granted and introduced exhibits and testimony concerning the proposed construction. The trial court, in directing that the plaintiffs' request for rezoning be granted, limited the judgment accordingly:

"In order that the plaintiffs be allowed to build townhouses upon said property."

Evidence regarding the success of other townhouse developments built in conjunction with golf course residential developments was presented by the plaintiffs. These other golf course developments, however, were in far distant areas of metropolitan Tucson and their original zoning provided for multi-family residences.

There was testimony presented to the effect that some people prefer to live in denser areas while others prefer to live in rural areas and therefore low density zoning is established to provide for the welfare of people that seek the rural way of life. The low density zoning minimized traffic hazards, dust and air pollution, noise and other disagreeable facets of high density living.

We take judicial notice of the fact that the City of Tucson, by virtue of its climate, which affords relief from numerous ills such as arthritis and respiratory difficulties, has a unique attraction. Bearing this in mind, we fail to see how low density zoning cannot but be consistent with and promotive of the general health and welfare.

In other jurisdictions not favored with the unique Arizona climate, single residence zoning up to five acres per unit has been upheld. See, Levitt v. Incorporated Village of Sands Point, 6 N.Y.2d 269, 189 N.Y.S.2d 212, 160 N.E.2d 501 (1959); Simon v. Town of Needham, 311 Mass. 560, 42 N.E.2d 516, 141 A.L.R. 688

(1942);[2] Flora Realty and Investment Co. v. City of Ladue, 362 Mo. 1025, 246 S.W.2d 771 (1952); Levy v. Board of Adjustment of Arapahoe County, 149 Colo. 493, 369 P.2d 991 (1962); Senior v. Zoning Commission of New Canaan, 146 Conn. 531, 153 A.2d 415 (1959); Cobble Close Farm v. Board of Adjustment of Middleton, 10 N.J. 442, 92 A.2d 4 (1952); Fischer v. Bedminster Tp., 11 N.J. 194, 93 A.2d 378 (1952); Jones v. Town of Woodway, 425 P.2d 904 (Wash.1967).

Another factor which was considered by the Board of Supervisors was that the grant of this rezoning request would "open the door." In other words, if this request were granted, it would be difficult for the Board to refuse other requests, with the inevitable result that the rural character of the neighborhood would be destroyed. In the case of Downs v. City of Little Rock, 240 Ark. 623, 401 S.W.2d 210 (1966), the Supreme Court of Arkansas deemed such factor worthy of consideration:

> "If this property were rezoned, where would the rezoning end? If these two lots are to be placed in a different category than 'B' Residential District, why should not the lot just north of Lot 12 be placed in the same category—and so on *ad infinitum*?" 401 S.W.2d, at 212.

The plaintiffs' theory, as we have previously indicated, was that the CR–1 zoning as to the subject parcels was confiscatory, hence invalid. In order to prevail in this contention, they were required to affirmatively demonstrate that the property could not be used for any reasonable purpose. City of Phoenix v. Fehlner, supra; DePaul v. Board of County Commissioners, 237 Md. 221, 205 A.2d 805 (1965). We do not believe the plaintiffs made the requisite showing. They place considerable emphasis on the testimony of Mr. Solot, an expert real estate appraiser. Portions of his testimony are as follows:

"Q. Mr. Solot, in regard to the land we are talking about which is indicated as you know on plaintiffs' exhibit one and three, can you tell us in your opinion whether or not this land can be used for residential purposes *in an economic way?*

A. *It could be used for residential purposes* but in my opinion it wouldn't be a use in keeping with the terms of the concept of highest and best use as the appraiser knows it.

Q. What is the concept of highest and best use?

A. The greatest net return of the land over any given period of time is what I call highest and best use. *You have a very luxurious dwelling on a small site, a street that can be widened to 150 ft.* In my mind it wouldn't bring a value equal to what it would cost to build it. It would be an *improper* improvement in the long run. This is what I mean." (Emphasis supplied)

And:

"Q. * * * couldn't the property that is concerned here of the proposed

---

2. In this Massachusetts case, a zoning law which prescribed the minimum area of one acre for residential lots was upheld as a reasonable and valid restriction in view of the location of the district, the physical characteristics, and other circumstances present. Among the factors considered pertinent in relation to the municipality's power to so regulate the size of house lots in a district which appeared "admirably suited for one family residences" were the following: avoidance of "congestion in the streets"; prevention of "overcrowding of land"; facility in furnishing "transportation, water, light, sewer and other public necessities"; provision of recreational space for "children to play"; encouragement of the "cultivation of flowers, shrubs and vegetables." (42 N.E.2d, at 518) While the court recognized that there might be a "difference of opinion" as to the real advantages that would accrue from the larger lots and whether they were such as to lead one to the conclusion that the adoption of the one acre area would result in a "real and genuine enhancement of the public interests," still a belief that such a result would be realized under the particular circumstances was "not unreasonable" and precluded "the measure" from being held "invalid." (42 N.E.2d, at 518)

sites of those townhouses, couldn't this be *successfully* used as one acre residential lots as the rest of the sister lots in the 49'er group have been used or plan to be used?

A. I don't think so *successfully.*

Q. That is what I want to really get to, defining successfully. Defining it do you mean that just absolutely it couldn't be done even on a break-even basis or it wouldn't be as profitable as the program that the plaintiffs here are proposing?

A. I mean that whatever *these buildings* would cost, that is the homes would cost, that would be built upon these one acre sites, their cost would be much less than what they would be worth. They would sell for less than what they cost. This would not put the land to its highest and best use in keeping with the tone of the market.

Q. * * * I am asking you to assume that we are going to make a use which while admitted in the appraiser's term is not the highest and best use, might be of satisfactory use or might be some use that is less than confiscatory of the plaintiffs' property, you see. So I am asking you in that context if there is any reason why the areas proposed by this sort of development couldn't be developed as the rest of the lots in 49'ers are proposed for development. That is, on about 36,000 or 24,000 feet per homesite?

A. I would say that they could be developed for—under those contingencies that you have mentioned. They could be developed for those uses along with the other lots in the subdivision. However, this would not in my mind be a *prudent* use of the land.

*   *   *   *   *   *

Q. * * * I am asking you if it wouldn't be—if the land wouldn't be usable for single-family dwellings?

A. Yes, it would be usable for single-family dwellings. I can best—if I might explain.

Q. Yes.

A. Point out that the corner of Speedway and Campbell was usable for retail stores at the northeast corner. It was razed, however, very recently and a new service station was put up indicating a change in highest and best use. This land was not being put to its highest and best use. It would not meet its *greatest potential* as residential land." (Emphasis supplied)

And:

"Q. What you are saying here, what you say that these lands that lie along Tanque Verde here shown in this exhibit is that they ought to be in terms of prudent development *they* ought to go the direction of the plaintiffs' use. You are saying that it would be more profitable if they go that direction? If they go the direction of all their lots and it goes one house per one acre or whatever they are, whatever they are, 12 or 15 lots?

A. They could go that direction. I don't think the *marketability* would be the same as the other sister lots as you—I think the saleability and and desireability (sic) would be much less. This is my reason for this. Sure, you could put them to residential use in keeping with all the factors involved except that when you consider the 150 ft. planned right-of-way on Tanque Verde and also the Soldier's Trail and other factors, *I don't think this would be sensible."* (Emphasis supplied)

And:

"Q. Mr. Solot, in terms of the market place and certainly that is where your qualifications runs (sic), I believe, can this land be used for

residential purposes by the 49'ers Country Club Estates?

Q. Did the effect and extent of the restrictions have anything to do with the opinion you just stated?

A. Yes.

Q. What was that? What effect did it have?

A. Restrictions or—don't include the lots or the parcels in question here. The restrictions only refer to the other land, other lots, what makes up 49'ers which permit them to be used for residential purposes and these sites can be used for other purposes, possibly subdividers looking into the future left this out to accomodate the change."

Other than Mr. Solot's testimony, there is little more in the record to indicate the unsuitability of the subject parcels for single residence purposes. Another witness for the plaintiffs was the subdivider, plaintiffs' predecessor in interest. He testified:

"Q. You tell me what you said about CR 1 lots, you and your partner subdivided on each side of Soldier's Trail in here.

A. I said I thought the ones marked block in red [the property sought to be rezoned] because of the highway would not—could not be utilized as residential lots certainly from a selling standpoint they would be very *difficult to sell.*" (Emphasis supplied)

And:

"Q. Can you tell us what the original developers' main theory and idea was as regards the property marked in red and that I have just identified to you.

A. Well, *that piece of property has no value as residential lots for many reasons.* One, in order to get this zoning we had to dedicate 150 feet of Spanish Trail to the county because their original project was to bring Soldier's Trail down across Tanque Verde right through the middle of this property and they needed 150 feet right of way and then two, we had those lakes on the property so geographically it had no—you couldn't require substantial lots. It's good enough for homes and of course this proposed highway would make it an intersection more or less of a traffic position where people don't want to live. That is pretty obvious. Then third, deed restrictions to the other lot would object to it so it had no utility.

Q. For residential?

A. For residential homes." (Emphasis supplied)

Mr. Livesay, a builder and resident of the 49'er subdivision, testified:

"Q. * * * Can you tell us whether or not this property can be used for residential purposes, whether it can or not?

A. It is not *regularly adaptable* for single family residences because of it being adjacent to Tanque Verde and also on the corner of Soldier's Trail, being split by Soldier's Trail. Also, the topography doesn't really *suit* residences." (Emphasis supplied)

A resident of the subdivision, who confessed to being no "expert" expressed doubts as to whether the property was "too good" for residential development.

On the other hand, Mr. Moore, a real estate developer and broker, and president of Skyline Realty and Development, called as a witness by the plaintiffs, testified:

"Q. Now in your opinion as a realtor and one engaged in this particular aspect of the real estate market wouldn't you agree that there isn't really any reason why 49'ers Country Club can't be sold out and developed on a one acre lot basis?

A. No I can see no reason why it couldn't any more than ours.

Q. In other words,—

A. It is a matter of time with any subdivision."

Mr. Garcia, a member of the planning and zoning commission, testified:

"Q. Now, in your opinion as a professional planner engaged as you stated more or less 18 years in the subdivision and review of property with respect to land use compatability, does the CR–1 zoning presently on the land afford a practical opportunity for its development? That is, is this a suitable use of the land to develop it according to its present zoning, CR–1?

A. Yes, I would say you could develop it as CR–1."

The plaintiffs contend that "the record is clear that the zoning," as it presently applies to their property, "is confiscatory." We have painstakingly detailed the testimony bearing on the issue of "confiscation" and find it is lacking in the "clarity" they espouse.

Even viewing it most favorably from the plaintiffs' standpoint, we fail to see an affirmative demonstration that the property cannot reasonably be used under the present zoning. Examination of Mr. Solot's testimony discloses that he predicates his opinion that the property could not be developed "successfully" for single-residence housing primarily upon the assumption that "you have a very luxurious dwelling on a small site" adjacent to "a street that can be widened to 150 feet." We do not believe that one can equate inability to build a "very luxurious dwelling" with lack of "reasonable use." Could not these lots be utilized for dwellings less "luxurious" from the standpoint of size with greater set-back from the street? The plaintiffs had no vested right to build only "luxurious" dwellings—valid exercise of the police power deprived them of this. Cf. Moton v. City of Phoenix, 100 Ariz. 23, 410 P.2d 93 (1966).

The case of Maywood Proviso State Bank v. Village of Berkeley, 55 Ill.App.2d 84, 204 N.E.2d 144 (1965) bears a marked resemblance to the instant case. The trial court had held that the single-family zoning was confiscatory as to the property involved and declared the zoning ordinance unconstitutional and void in its application to the property. The Illinois appellate court reversed. It rejected the plaintiffs' contention that railroad tracks made the zoning unreasonable and the property unsuitable for single-family residential purposes. Pointing out that the mere fact that the land would be worth more if the existing ordinance were to be invalidated is not determinative and does not necessarily justify a conclusion that the ordinance is confiscatory, the court stated:

"The plaintiff, Swiech, bought this property with his eyes open. From his long experience in the realty business he must have known with reasonable certainty whether the property would lend itself to single-family residences and whether they would be marketable when built. If he thought when he purchased it that it was unsuitable for this purpose, then he took a business risk that the prevailing zoning could be changed to one more favorable. * * *

*     *     *     *     *     *

"The hardship upon the plaintiffs, if any, does not justify our holding that the zoning ordinance of Berkeley is arbitrary, unreasonable or invalid as applied to their property." 204 N.E.2d, at 147–148.

In the case of Baum v. City and County of Denver, 147 Colo. 104, 363 P.2d 688 (1961), the validity of a zoning ordinance classifying the plaintiffs' property as residential was challenged. In order to establish that the ordinance was confiscatory as applied to their property, they offered proof as to the suitability of their property for single-family homes. Three expert witnesses testified in effect that residential uses or development of the plaintiffs' land was "poor", "undesirable", "not feasible", or "not the best use". The court, in pointing out that none of the experts testified that the

property could not be used or developed for single-family residences, stated:

"All such testimony may be summed up as showing nothing more than that residential use or development of plaintiffs' land is undesirable because business or commercial uses or development thereof *would be better, best or more profitable*." (Emphasis in original) 363 P.2d, at 694.

■ The plaintiffs presented a great deal of evidence to show that the value of adjoining property would not be affected by the rezoning. Such factor, however, though worthy of consideration as to whether rezoning should be granted where it is otherwise proper to do so, is insufficient as a legal ground for declaring a zoning ordinance unconstitutional at the instance of one who seeks a zone change. City and County of Denver v. American Oil Co., 150 Colo. 341, 374 P.2d 357 (1962). Equally insufficient is the fact that other golf course subdivisions included parcels zoned for multi-family residences.

. ■ Upon this state of the record, we do not believe judicial intervention was warranted. The legislative judgment should not be disturbed save in very unusual instances. It is immaterial that we would have been wiser if performing the legislative function. The doctrine of separation of power renders conclusive upon us the legislative determination within its sphere of government. As Mr. Justice Holmes said in Noble State Bank v. Haskell, 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112, on rehearing, 219 U.S. 575, 31 S.Ct. 299, 55 L.Ed. 341 (1911):

"We fully understand * * * the very powerful argument that can be made against the wisdom of the legislation, but on that point we have nothing to say as it is not our concern." 31 S.Ct., at 300.

For the reasons herein expressed, the judgment is reversed with directions to enter judgment for the defendants "that plaintiffs take nothing by their complaint."

MOLLOY, J., and ALICE TRUMAN, Superior Court Judge, concur.

NOTE: Judge JAMES D. HATHAWAY having requested that he be relieved from consideration of this matter, Judge ALICE TRUMAN was called to sit in his stead and participate in the determination of this decision.