720 P.2d 528

Joyce M. CORRIGAN,
Plaintiff-Appellant,

v.

CITY OF SCOTTSDALE, a municipal corporation, Defendant-Appellee.

No. 1 CA–CIV 6300.

Court of Appeals of Arizona,
Division 1, Department A.

Feb. 28, 1985.

Fennemore, Craig, von Ammon, Udall & Powers, P.C., by James Powers, Phoenix, for plaintiff-appellant.

Richard Filler, Scottsdale City Atty. by Donald O. Loeb, Asst. City Atty., Scottsdale, for defendant-appellee.

## OPINION

GRANT, Judge.

In this appeal we consider the validity of the City of Scottsdale's zoning ordinance establishing the Hillside District. In November, 1977 Scottsdale rezoned the area in and around the McDowell Mountains into the Hillside Conservation Area (Conservation Area) and the Hillside Development Area (Development Area). Essentially no new development was permitted on land falling within the Conservation Area. Joyce Corrigan, appellant (Corrigan), who owns land within the Hillside District, brought suit to declare the ordinance unconstitutional and prayed for monetary damages for taking of property. Subsequently Corrigan also unsuccessfully sought to raise the issue in the trial court of whether the ordinance is authorized by the state enabling legislation. After an

adverse judgment sustaining the validity of the ordinance Corrigan brought this appeal.

The issues raised are:

(1) whether the trial court erred in not considering evidence of the intent of the Planning Commission and its staff;

(2) whether the Hillside District zoning ordinance is authorized by state law;

(3) whether the Hillside District zoning ordinance is an unconstitutional exercise of police power;

(4) whether appellant is entitled to money damages for an illegal taking.

The background facts are as follows. Corrigan owns a large parcel of land comprising approximately 4,800 undeveloped acres. Touching this central parcel at a single point at its northwest corner is a smaller parcel of approximately 608 undeveloped acres also owned by Corrigan. Corrigan owns a third parcel of approximately 330 undeveloped acres which connects with the central parcel at the central parcel's southwest corner. All of this property is located within the City of Scottsdale and is part of, or close to, the McDowell Mountains.

The McDowell Mountains, located at the north end of the City of Scottsdale, constitute a unique geographic area. The mountains and surrounding hillsides are the only hilly or mountainous terrain within the city limits. While the elevation of the developed part of Scottsdale is approximately 1,250 feet, elevations in the McDowell Mountains rise to over 4,000 feet. As of November, 1977 no development of any kind was located in or near the McDowell Mountains within the corporate limits of Scottsdale.

Corrigan's property previously had been part of the DC Ranch, owned by Kemper Marley[1] and E.E. Brown. In the early 1960's the ranch lay outside the corporate boundaries of Scottsdale. In 1963, Scottsdale annexed the southern part of the ranch, including Corrigan's property. The newly annexed property was zoned R–1–35,

a classification permitting single family residences on lots of at least 35,000 square feet. This zoning classification was generally regarded as a "holding" classification for rural property which was not ready for development.

After the death of E.E. Brown in 1966, Corrigan purchased from Brown's children their one-half interest in the estate, which included a one-fourth interest in the partnership. Corrigan paid in excess of two million dollars for the children's interest. Upon the death of Brown's widow, the partnership between Marley and Brown was liquidated and its real estate holdings partitioned. The estate of E.E. Brown was awarded certain land, including the property involved here, which the probate court in 1973 distributed to Corrigan as assignee of Brown's children. As part of these partition proceedings property owned by Corrigan's father is also affected by the challenged ordinance.

On November 15, 1977 the zoning ordinance of Scottsdale was amended by adding sections 6.800 through 6.807, which create the Hillside District. Scottsdale, Ariz., Ordinance 455 § 6.800–.807 (1977) [hereinafter cited as Ordin. § ——]. The Hillside District ordinance established two areas, the Conservation Area and the Development Area, separated by a "no development" line. Ordin. § 6.802. Land within the Conservation Area, which is above the "no-development" line, is set aside solely for the conservation of permanent natural open space, while land within the Development Area can be developed subject to certain limitations. Ordin. §§ 6.802, .805–.807. The no-development line is located where any of the following conditions occur: unstable slopes subject to rolling rocks, rockfalls or landslides; bedrock areas; slopes of 15 percent or greater; and shallow, rocky mountain soils subject to severe erosion. Ordin. § 6.802(A). These criteria identify where a mountain begins. An adjustment procedure exists as to determination of the no development

---

1. Kemper Marley is appellant's father.

line. Ordin. § 6.806(C).[2] Pursuant to a 1979 amendment, the Conservation Area shall not "be required to be more than eighty (80) percent of any land held in single common ownership that existed on October 8, 1977." Ordin. § 6.806(C)(2).

Land within the Conservation Area is to be "legally secured for the conservation of permanent natural open space through easements or dedication." Ordin. § 6.806(A)(3). No buildings, structures or impermeable surfaces are permitted in the Conservation Area. Ordin. § 6.806(B). Density credits are allotted for land above the no development line, Ordin. § 6.806(A)(1), which may be transferred for use in adjacent land within the Development Area.[3] These density credits are also referred to as Transferable Development Rights.

Land within the Development Area is subject to certain limitations imposed by the Hillside Ordinance. Depending on the degree of slope a fixed percentage of a site sought to be developed must be retained in its natural state. Ordin. § 6.807(A)(1). A density bonus is allowed where a developer sets aside an extra 20% natural area than is otherwise required for a proposed development of single-family residences in an R–1 zone. Ordin. § 6.807(B).

A study of ownership patterns within the Hillside District showed that the land remained in a few large ownerships. This study of the ownership patterns revealed that owners of property in the mountains, including Corrigan, had developable areas below the no-development line (within the so-called "receiving area") sufficient in size to accommodate the transfer of density credits from the land above the no-development line within the Hillside Conservation District.

The no-development line does not impinge on the two small parcels of land owned by Corrigan; however, of the approximately 4,800 acres contained in the central block, 80% or 3,836 acres, lie above the no development line. Assuming Corrigan could obtain the maximum adjustments on the placement of the no-development line, 3,523 acres, or 74% of the central block, still would lie within the designated conservation area.

## I.

## INTENTIONS OF THE DRAFTERS OF THE ORDINANCE

At trial Corrigan introduced evidence concerning the intent of the City's Planning Commission and its staff with respect to promulgation of the Hillside Ordinance. This evidence tended to show that the primary motivation in proposing the ordinance was to preserve the McDowell Mountains in their natural state for the benefit of all residents of the City. Distilled, Corrigan's argument is that the primary purpose of the ordinance is to obtain a permanent

---

**2.** Under the adjustment procedure the no-development line can be moved to a point where two of the specified conditions occur. Ordin. § 6.806(C).

**3.** Ordin. § 6.806(A) states:
   A. *General provisions*
   1. Although development shall not be allowed in the Hillside Conservation area, density credit may be transferred to adjacent Hillside Development land contained within the application, subject to:
      a. Density credit derived from existing underlying zoning in the HC area, at the following rates:
      (1) R1–43:0.8 units per acre
      (2) R1–35:1.0 units per acre
      b. Regulations of this ordinance and other applicable City ordinances which will apply to development in the HD area;

   c. Density limitations of the zoning in the HD area as ultimately approved by the City Council:
   d. The ownership pattern on record on October 8, 1977, the date of the public notice of the zoning ordinance amendment to establish the Hillside District.
   2. Rezoning of the HD area to achieve the higher densities made available through density credit transfer shall result in removal of the underlying zoning in the JC area.
   3. The land within the Hillside Conservation area shall be legally secured for the conservation of permanent natural open space through easements or dedication.
   4. No grading, filling, clearing or excavation of any kind shall be allowed in the Hillside Conservation area.

mountain preserve for the public without cost. The trial court concluded that as a matter of law inquiry into the motives behind enactment of the ordinance was precluded. We agree.

■■■ Zoning ordinances are legislative acts. *Wait v. City of Scottsdale,* 127 Ariz. 107, 618 P.2d 601 (1980). Courts will not inquire into the motives of the legislative body which enacts a particular piece of legislation. *Id.; Tucson Community Development & Design Center, Inc. v. City of Tucson,* 131 Ariz. 454, 641 P.2d 1298 (App.1981).[4] Nor will courts inquire what evidence or reasons were presented to sway the legislative body. *Tucson Community Development & Design Center, Inc. v. City of Tucson.* The principal test to be applied by a trial court on the issue of a zoning ordinance's constitutionality is whether the zoning bears a substantial relation to the public health, safety, morals or general welfare. *Cardon Oil Co. v. City of Phoenix,* 122 Ariz. 102, 593 P.2d 656 (1979); *Bartolomeo v. Town of Paradise Valley,* 129 Ariz. 409, 631 P.2d 564 (App.1981). As long as the reasonableness of the ordinance in question is fairly debatable the courts must uphold the zoning ordinance. *Id.; Dye v. City of Phoenix,* 25 Ariz.App. 193, 542 P.2d 31 (1975).

■■■ Corrigan apparently accepts these general propositions but argues that legislative history is a proper method of ascertaining the legislative intent or purpose in enacting a law. *E.g., Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976); *State v. Barnard,* 126 Ariz. 110, 612 P.2d 1073 (App.1980); *State ex rel. Swartout v. Civil Service Commission,* 25 Wash.App. 174, 605 P.2d 796, *Cert. Denied,* 449 U.S. 992, 101 S.Ct. 527, 66 L.Ed.2d 288 (1980). Legislative intent is relevant, however, only in *interpreting* a statute or ordinance. Corrigan argues that her evidence aided in defining the phrase "permanent natural open space." We do not see how

evidence, tending to show that the City wanted, through the Hillside Ordinance, to establish a public mountain preserve in the McDowell Mountains, would facilitate a knowledgeable interpretation of that phrase. We therefore find no error.

## II.

### AUTHORIZATION OF ORDINANCE UNDER STATE LAW

Corrigan also argues on appeal that the Hillside Ordinance is not authorized by state enabling legislation. It is clear that the Arizona Legislature has preempted the field of zoning legislation and has set forth guidelines for cities. *Committee for Neighborhood Preservation v. Graham,* 14 Ariz.App. 457, 484 P.2d 226 (1971). *See Public Regulation of Private Land Use in Arizona: An Analysis of its Scope and Potential,* 1973 Law and Soc. Order 747. Corrigan asserts that the state has refused to give municipalities the right to use zoning power to set aside land for permanent open space. Scottsdale counters this assertion by arguing that Corrigan failed to timely raise this issue in the lower court, and that it should not be considered on appeal. Alternatively, it is argued that the ordinance is authorized under state enabling legislation.

The complaint in this action was filed on November 21, 1977. After extensive discovery the matter went to trial beginning on November 19, 1980 and concluded with final argument on April 9, 1981. Shortly before final argument, and after both sides rested, Corrigan filed a pleading entitled "Notice of Plaintiff's Basis for Argument." The notice indicated for the first time that Corrigan asserted that the Hillside Ordinance exceeded the scope of Scottsdale's zoning power as established by state enabling legislation (A.R.S. § 9–462 *et seq.* ). No previous pleading or memorandum had dealt with or mentioned this issue. Scottsdale objected to the insertion of this new

---

**4.** No equal protection claim based on racial discrimination is involved, which would permit an inquiry into the motives of the municipal body. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

issue as untimely and prejudicial. The trial court ruled that the issue was untimely and inclusion of the issue would be unfair to Scottsdale.

An appellant generally may not raise issues on appeal that were not properly raised in the court below. *Seven G Ranching Co. v. Stewart Title & Trust,* 128 Ariz. 590, 627 P.2d 1088 (App.1981); *Cohen v. State,* 121 Ariz. 20, 588 P.2d 313 (App. 1977), *aff'd in part, vacated in part,* 121 Ariz. 6, 588 P.2d 299 (1978); *Payne v. Payne,* 12 Ariz.App. 434, 471 P.2d 319 (1970). Corrigan recognizes this principle but in support of presenting this issue relies on the principle that a court will avoid deciding the constitutionality of a statute, if the case may be decided on other grounds. *E.g., State v. Church,* 109 Ariz. 39, 504 P.2d 940 (1973); *Pendley v. Mingus Union High School District No. 4,* 17 Ariz. App. 512, 498 P.2d 586, *vacated,* 109 Ariz. 18, 504 P.2d 919 (1972).

In *Pendley v. Mingus Union High School District No. 4* the court raised *sua sponte* an issue to avoid addressing the constitutionality of the school district's regulation of male students' hair length. On appeal both parties had briefed and argued the constitutional issues. The court stated:

Although the parties before us delve deeply into the constitutional aspects of the rights of this student and the authority of school officials to regulate his hair length, we have concluded, without invocation of constitutional law, that the regulation is in excess of the school district's authority.... Although the issue appears to have been raised in the trial court, practically all arguments on appeal have been devoted to the constitutional aspects. Since the authority of the school board is in question, and in view of the normal preference to decide on a nonconstitutional basis where that avenue is open, [citation] we will address ourselves *sua sponte* to the question of the school district's authority to enact the regulation in question.

*Id.* at 514, 498 P.2d at 588. In *Pendley,* unlike here, the issue raised *sua sponte* had been fully addressed in the trial court.

The applicable law is set out in the decision of *Town of Scottsdale v. State ex rel. Pickrell,* 1 Ariz.App. 85, 399 P.2d 706 (1965). That case involved an action to declare certain annexation ordinances, as well as the city charter authorizing them, illegal. The City of Scottsdale conceded in the trial court that imperfections in annexation procedures rendered the ordinances unlawful. Nevertheless, the trial court proceeded to determine the issue as to the validity of the city charter.

On appeal the *Town of Scottsdale* court stated:

There is respectable authority to the effect that a court will not usually consider a constitutional question when the case can be determined without ruling upon that question. It is our opinion that this is not a question of "lack of jurisdiction in the trial court" but rather a question as to the exercise of judicial discretion in relation to the trial of the issues then presented. We will not review the exercise of discretion by the trial court but will review the validity of the trial court's determination of the constitutional issue.

*Id.* at 87, 399 P.2d at 708. The decision at issue is also a discretionary one.

■ It is unfortunate that all issues relating to the validity of these ordinances were not raised and considered in one case. While we are not convinced that inclusion of this issue would have necessitated undue prolonging of the trial of the entire matter, Scottsdale was placed at a serious disadvantage by the untimely raising of this issue. Furthermore as pointed out in the findings of the trial court, the pleadings and the evidence did not address the issue; nor was the issue raised with any specificity. We therefore conclude that there was no abuse of discretion by the trial court in refusing to consider whether the Hillside Ordinance was authorized by state enabling legislation. This brings us to the central issue.

## III.

### CONSTITUTIONALITY OF THE HILLSIDE DISTRICT AMENDMENT

■ The central issue in this appeal is whether the Hillside Ordinance is unconstitutional as a taking without just compensation.[5] In part the fifth amendment to the United States Constitution, made applicable to the states through the fourteenth amendment, states:

[N]or shall private property be taken for public use, without just compensation.

In assessing the constitutionality of municipal zoning ordinances certain principles have been established. The rule that the trial court will be upheld if there is evidence in support of the judgment is not the applicable rule in zoning cases. However zoning ordinances are presumed to be valid. *City of Phoenix v. Oglesby*, 112 Ariz. 64, 537 P.2d 934 (1975); *Peabody v. City of Phoenix*, 14 Ariz.App. 576, 485 P.2d 565 (1971). This court does not sit as a superzoning commission, and will not pass judgment on the wisdom of the ordinance. The function of the Court of Appeals is to determine whether the record shows a reasonable basis for action of the zoning authority, and if the reasonableness of the ordinance is fairly debatable it will not be disturbed. *City of Tempe v. Rasor*, 24 Ariz.App. 118, 536 P.2d 239 (1975). The burden rests on the party asserting invalidity to clearly and affirmatively demonstrate that the ordinance is unconstitutional. *City of Phoenix v. Collins*, 22 Ariz. App. 145, 524 P.2d 1318 (1974).

Corrigan has not submitted a plan for development of her property under the ordinance. In *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, the United States Supreme Court held that:

Because the appellants have not submitted a plan for development of their property as the ordinances permit, there is as yet no concrete controversy regarding the application of the specific zoning provisions.... Thus, the only question properly before us is whether the mere enactment of the zoning ordinances constitutes a taking.

447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 111–12 (1980). *See also Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Aptos Seascape Corp. v. County of Santa Cruz*, 138 Cal.App.3d 484, 188 Cal.Rptr. 191 (1982), *appeal dismissed* 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 73 (1983). Similarly we are called upon to decide only whether the mere enactment of the Hillside Ordinance effected a taking of Corrigan's property.

■ There are no set formulas for determining at which point a regulation effects a taking of property. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). Rather a two step process is required. First, we must determine whether a legitimate state interest is substantially advanced by the ordinance at issue. *Agins v. City of Tiburon*. Second, we focus on whether the ordinance denies the owner the economically viable use of the land. *Id.* Ultimately the issue is whether the public at large, rather than a few landowners should bear the burden of an exercise of police power. *Id.; Penn*

---

5. Article 2, Section 17 of the Arizona Constitution provides in part:

Private property shall not be taken for the private use.... No private property shall be taken or damages for public or private use without just compensation having first been made, paid into court for the owner, secured by bond as may be fixed by the court, or paid into the State treasury for the owner on such terms and conditions as the Legislature may provide, and no right of way shall be appropriated to the use of any corporation other than municipal, until full compensation therefor be first made in money, or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived as in other civil cases in courts of record, in the manner prescribed by law. Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public.

*Central Transportation Co. v. City of New York.*

Police power is based on the necessity to safeguard the public interest. Its concept is a dynamic and changing accommodation to the complexities of modern society. Because of the nature of police power, its exercise frees a governmental body from liability for compensation for resulting private losses. However, exercise of police power does not include the power of eminent domain. Police power cannot extend beyond the necessities of the case and be made a cloak to destroy constitutional rights relating to the inviolateness of private property. An arbitrary, conceived regulation will be nullified as a disguised attempt to take private property for public use without resort to eminent domain. A strong public desire to improve public conditions is not enough to warrant achieving the desire by a shorter cut rather than the constitutional way of paying for the change. *Transamerica Title Ins. Co. v. City of Tucson,* 23 Ariz.App. 385, 533 P.2d 693 (1975).

In this case we are required to determine whether the use of Transferable Development Rights or density credits to preserve open space is an exercise of the police power or of the power of eminent domain. Footnote 5 *ante. See* Note, *The Unconstitutionality of Transferable Development Rights,* 84 Yale L.J. 1101 (1975). In making this determination we must differentiate between a valid application of the noncompensatory governmental police power, and those actions which constitute an exercise of eminent domain requiring payment of just compensation. *See* Note, *Rezoning Subject to Conditions,* 18 Ariz. L.Rev. 786 (1976). We acknowledge the power of a municipality to impose conditions on zoning or rezoning but such conditions cannot exceed the scope of police

power. *Id.* The primary function of police power is to safeguard the public interest from private endeavors posing potential threats to the general welfare. However, in the final analysis zoning power may not be substituted as a guise for eminent domain. Municipal attempts to usurp police power in order to avoid just compensation will be struck down. Public need is the *sine qua non* of reasonableness. Does a deplorable condition exist or is it likely to occur under existing zoning? *See id.*

Corrigan on appeal and at the trial level never seriously argued that the Hillside Ordinance does not substantially advance legitimate state interests. As the first step the trial court found that the ordinance is reasonably related to public health, safety, morals, and general welfare. Among the safety concerns justifying the Hillside Ordinance were: minimizing the harm from the phenomenon known as rolling rock;[6] preventing rock slides due to blasting; reducing the damages from washouts and landslides; and avoiding the difficulties in fighting fires in mountainous terrain. Also, evidence produced at trial revealed that the McDowell Mountains, which are Scottsdale's only mountains, enhance property values in their natural state. Furthermore, development in the mountains could result in unsightly scarring.[7] However, public interest in aesthetics, standing alone, is often too vague to offset substantial injury to a landowner in a rezoning case. *Brown v. Dougherty,* 250 Ga. 658, 300 S.E.2d 509 (1983). *See also City of Austin v. Teague,* 570 S.W.2d 389 (Texas 1978). The evidence does not support nor did the trial judge find that a deplorable condition exists or would exist without the Hillside Ordinance. Although the trial court found certain safety concerns it did not find there would be a substantial threat to public safety without

6. The term "rolling rock" describes the loosening of rock formations due to erosion and weather conditions. The loosened formation then slides downward.

7. Aesthetics are a proper consideration in determining the validity of a zoning ordinance, especially where aesthetics are auxiliary to more traditional public interests. *City of Scottsdale v. Arizona Sign Ass'n, Inc.,* 115 Ariz. 233, 564 P.2d 922 (App. 1977); 3 Rohan, *Zoning & Land Use Controls* §§ 16.04—16.04(3), at 16–49 to 16–124 (1978).

the ordinance. Obviously there often is and has been building in mountainous or hilly areas within the Valley of the Sun. Therefore the ordinance was not a valid exercise of police power.

■ The second step focuses on whether the ordinance denies the landowner an economically viable use of the land. *Agins v. City of Tiburon.* In assessing the financial impact of the Hillside Ordinance it must be borne in mind that:

> Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.

*Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322, 325 (1922). Thus, to constitute a taking, a regulation must preclude use of land for any purpose for which it might reasonably be adapted. *Wait v. City of Scottsdale.* It is further recognized that rezoning does not constitute a taking merely by causing a decrease in property value. *Cardon Oil Co. v. City of Phoenix; City of Phoenix v. Fehlner,* 90 Ariz. 13, 363 P.2d 607 (1961). The prohibition against taking private property for public use without just compensation, contained in both our state and federal constitutions, is designed to protect not only the landowner's proprietary interest, but also his or her economic interest. One of the purposes of the Fifth Amendment guarantee that private property shall not be taken for public use without just compensation was to bar Government from forcing some people to bear public burdens which in all fairness and justice should be borne by the public as a whole. *Armstrong v. U.S.,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554, 1561 (1960). As cited in *State ex rel. Herman v. Southern Pacific Co.,* 8 Ariz.App. 238, 240, 445 P.2d 186, 188 (1968), "To establish that an ordinance is confiscatory, it must be shown that the restrictions preclude use of the property for 'any purpose to which it is reasonably established.' *Rubi v. 49'er Country Club Estates, Inc.,* 7 Ariz.App. 408, 440 P.2d 44 (1968)." *Klensin v. City of Tucson,* 10 Ariz.App. 399, 403, 450 P.2d 316, 320 (1969).

■ When reviewing a zoning ordinance the court must determine whether it is confiscatory or merely unreasonable and arbitrary. A zoning ordinance will be deemed confiscatory if it effectively deprives a property owner of the beneficial use of his or her property by precluding *any* reasonable use of it. *City of Hollywood v. Hollywood, Inc.,* 432 So.2d 1332 (Fla.Dist.Ct.App.1983). No one in this case denies that the Hillside Ordinance deprives appellant of any use of her main parcel of land.

■ Three major factors are to be considered in assessing whether or not a taking has occurred: (1) the character of the government action involved; (2) whether the land use restriction on real property may be held to constitute a taking if it is not reasonably related to a valid public purpose; and, (3) the economic impact of the regulation on the claimant. *Penn Central Transportation Co. v. City of New York.*

■ The ultimate resolution of whether the government has unconstitutionally taken private property follows an ad hoc factual determination that the full community rather than an individual property owner, should fairly assume the costs of the governmental action. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

■ Although the preservation of open space in the McDowell Mountains is a legitimate state interest, we must determine whether it can be done through the exercise of police power or whether it must be done through eminent domain with the required payment of just compensation. Zoning finds its authority in the police powers while eminent domain is the right and power of a sovereign state to appropriate private property to uses for the public good. *City of Scottsdale v. Municipal Court of Tempe,* 90 Ariz. 393, 368 P.2d 637 (1962). There may be a conflict between eminent

domain and police power as to which is the superior right in a particular fact situation. Courts must consider how the rights of the public, either under the necessity for taking of land for public use or benefit under eminent domain, or the denial of the particular use under police power, are related to the general welfare of the segments of the public in conflict. *Id.*, dissent by Lockwood, J. There is a balancing of interests involved.

In the context of the case before us we are faced with an ordinance which is an attempted hybrid between police power and eminent domain. The city claims this action is a legitimate exercise of police power and yet it attempts a form of compensation by way of transfer of density credits. If this were a valid exercise of police power there would be no need for any form of compensation.

We recognize the argument that the transferability of development rights, also termed density credits, provides an alternative to either buying the land sought to be preserved (which most municipalities cannot afford) or simply abandoning any attempt to preserve scenic or ecologically sensitive areas. *See The Transferability of Development Rights,* 53 U.Colo.L.Rev. 165 (1981).

> If a land use restriction deprives a landowner of any reasonable use of the land, or if the landowner cannot realize a reasonable economic return on his investment in the land, then the courts will hold that the restriction results in a "taking". Typically, government then has two choices: either to forego enforcing the restriction, or else to acquire the land through condemnation and give the landowner just compensation.
>
> The second choice, condemning the regulated land, is not usually feasible because few governments possess the funds necessary for acquisition of private lands for aesthetic purposes. Thus, the other option, not enforcing the restriction, is the more usual course.... A proposed alternative to this dilemma is the concept of "fair compensation," by

which a landowner is compensated for land use restrictions to the extent necessary to assure a reasonable return on his parcel of land.

*Id.* at 166–167 (footnotes omitted).

The question is thus presented: whether fair compensation can be given by transferring development rights as is attempted in the ordinance presently before us.

In determining whether a regulation effects a taking of property, the court will generally not divide a single parcel of land into discrete segments. *Penn Central Transportation Co. v. City of New York; DeMarie v. City of Lake Forest,* 93 Ill. App.3d 357, 48 Ill.Dec. 909, 417 N.E.2d 641 (1981). Several courts have recognized an exception where governmental action divides contiguous property under single ownership into separate zones with different zoning designations. *E.g., American Savings & Loan Ass'n v. County of Marin,* 653 F.2d 364 (9th Cir.1981); *Aptos Seascape Corp. v. County of Santa Cruz.*

In *Aptos* the California Appeals Court held:

> In other words, when governmental action has divided contiguous property under single ownership into separate zones, and has restricted development in one of those zones, a provision allowing some transfer of development rights from the restricted property or awarding compensating densities elsewhere may preclude a finding that an unconstitutional taking has occurred.

138 Cal.App.3d at 496, 188 Cal.Rptr. at 198. In that case Aptos Seascape Corporation owned 110 acres of real property, with 40 acres above the 100-foot contour line (the benchlands) and 70 acres below the contour line (subject property) which included beachlands, arroyos, and palisades. The 110 acres were purchased in 1963 and at that time were rezoned residential, with a commercial hotel use permitted on one portion of the benchlands. In 1972 the County of Santa Cruz rezoned the subject property as U–BS (unclassified—special building site area regulations) and the benchlands R–1–6–PD (one family residence—planned devel-

**564**

opment district: 6,000 sq. ft. minimum site area). The ordinance essentially prohibited any development on the 70 acres of beach-lands. Seascape filed suit alleging a taking of the subject property. Seascape had not filed a development plan or plans under the new ordinances. The appeals court in *Aptos* said that although development of the subject property is prohibited, the county's ordinances permitted granting of compensating densities to Seascape on the bench-lands and its other nearby properties. Therefore, the court concluded that mere enactment of the ordinance in question did not constitute a taking.

In *Fifth Avenue Corp. v. Washington County*, 282 Or. 591, 581 P.2d 50 (1978), the owner of a 20 acre parcel of land brought suit asserting, among other things, that the rezoning of its property pursuant to a 1973 zoning ordinance had effected a taking. The plaintiff purchased the land involved in 1965, at which time the zoning designation permitted construction of a "district shopping center" which the plaintiff planned to build. The 1973 zoning ordinance rezoned plaintiff's 20 acres into four different zoning classifications: commercial, residential, transit station, and greenway. In discussing the taking challenge in dicta the court divided the property analytically into two separate parcels: (1) those classified commercial or residential, and (2) those classified greenway or transit station. As to the first, no taking was found since substantial beneficial uses were permitted. As to the second, the court did state that a cause of action for inverse condemnation could be maintained.

In the case before us it is clear that the Hillside Ordinance prevents any development whatsoever on the largest parcel of Corrigan's land. This is a taking. Consistent with the conclusion that a taking occurred upon enactment of the Hillside Ordinance is the appraisal testimony. Robert Blake, an appraiser with 36 years experience, testified on behalf of Corrigan. As of November, 1980 [8] Blake valued Corrigan's property as follows: (1) assuming R-1-35 zoning—the mountains at $4,500 per acre and the lowlands at $7,000 per acre, and (2) assuming the Hillside Ordinance zoning—the *mountains at no value* and lowlands at $8,000 per acre.[9] Thus, Corrigan's property was worth $31,365,500 prior to enactment of the ordinance and $17,728,000 under the ordinance.[10]

Wendell Montandon, an appraiser with nine years experience, testified on behalf of the City of Scottsdale. Montandon's testimony which we summarize, relates to the value of Corrigan's property as of December 1980: (1) assuming R-1-35 zoning—the mountains at $1,250 per acre [11] and the lowlands at $10,000 per acre, and (2) assuming the Hillside Ordinance zoning—the *mountains at no value* and the lowlands at $12,000 to $13,000 per acre.[12] Thus, Montandon concluded that Corrigan's property would be worth $26,563,750 zoned R-1-35 and approximatley $27,500,000 to $28,808,000 under the Hillside ordinance.[13] But both appraisers in presenting their respective appraisals agreed the mountains would have no monetary value under this ordinance.

---

8. Blake testified that the corresponding November, 1977 values would be one third less than the December, 1980 values.

9. Blake assumed a minimum density of 2.7 and a maximum of 3.2 dwelling units per acre in the lowlands with the density transfer.

10. See note 12 *infra.*

11. On the $1,250 value for mountain acreage Montandon assumed a 60% discount for an installment sale. Thus, the cash price for mountain land would have been $3,125 per acre.

12. Montandon also testified that the corresponding November 1977 values would be: (1) assum-

ing R-1-35 zoning—the mountains at $500 per acre and the lowlands at $4,000 per acre, and (2) assuming the Hillside Ordinance zoning—the mountains at no value and the lowlands at $4,400 to $4,800 per acre. Montandon calculated the $500 for mountain acreage assuming a 60% discount for an installment sale. Thus, the cash price for the mountains would be $1,250 per acre.

13. These figures are based on the assumption that 3,523 acres are in the mountains (above the no development line) and 2,216 acres are in the lowlands.

As noted in *Cardon Oil Co. v. City of Phoenix:*

> The principal constitutional test applied to zoning decisions is whether the zoning bears any substantial relation to the public health, safety, morals or general welfare. (citation omitted) When zoning power is used in such a way that the attempted regulation amounts to a "taking" of property, the zoning ordinance runs into direct conflict with A.R.S. Const. art 2, § 17, which prohibits government from taking private property without just compensation to the owners.

122 Ariz. at 104, 593 P.2d at 658. If the rezoning renders the property useless it amounts to a confiscation without compensation, making the attempted rezoning void. *Id.*

In this opinion we have set forth an extended discussion of the applicable law in order to demonstrate the difficulties encountered in resolving the conflicting and yet legitimate interests between private rights and public concern. This resolution cannot be made in a vacuum. Rather it must be made in the total context of the case presented with all of these considerations in mind. The ordinance in question is particularly beguiling in that it attempts to achieve a laudable goal—preservation of the McDowell Mountains in their natural state—without apparent cost. However we conclude and therefore hold that the Hillside Ordinance is void as an unconstitutional taking of appellant's property without just compensation. In reaching this conclusion we have determined that the Hillside Ordinance is an invalid use of police power and therefore it constitutes a taking of property for which just compensation must be made as required by both the federal and state constitutions. Further, we hold that under Section 17, article 2 of the Arizona Constitution the transfer of density credits does not constitute just compensation for property taken by eminent domain. This provision of our state constitution requires compensation for such a taking to be made by payment of money in an amount that has been judicially determined. Ariz.Const. art. 2, Section 17. The transfer of density credits cannot meet this state constitutional requirement. We therefore reverse the judgment of the trial court.[14]

BROOKS and CONTRERAS, JJ., concur.

---

**14.** On motion, the trial court dismissed the count for money damages on the strength of the holding in *Davis v. Pima County,* 121 Ariz. 343, 590 P.2d 459 (App.1978), *cert. denied,* 442 U.S. 942, 99 S.Ct. 2885, 61 L.Ed.2d 312 (1979). Corrigan asks this court to reverse on the basis of the holding in *San Diego Gas & Electric Co. v. City of San Diego,* 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981). We do not read that case as requiring a different result than mandated by *Davis v. Pima County.* We therefore affirm the trial court as to the dismissal of the count for money damages.