432 So.2d 1332 (1983)
CITY OF HOLLYWOOD, a Municipal Corporation, Appellant,
v.
HOLLYWOOD, INC., and Sherwood Investment Co., a Florida Corporation, Appellees.
No. 81-951.
District Court of Appeal of Florida, Fourth District.
April 27, 1983.
Rehearing Denied July 5, 1983.
*1333 Myron H. Burnstein of Salter, Yeslow & Burnstein, P.A., and Nancy Cousins, City Atty., Hollywood, for appellant.
Davis W. Duke, Jr., of McCune, Hiaasen, Crum, Ferris & Gardner, P.A., Fort Lauderdale, and Ellis, Spencer, Butler & Kisslan, Hollywood, for appellees.
LETTS, Chief Judge.
This appeal centers on a narrow strip of undeveloped beachfront land, originally platted as a single family subdivision. The City slashed the allowable multi-family densities on the western portion thereof and created a separate single family classification in the most eastern part adjacent to the ocean. As an alternative to building homes in this new single family classification, the owner developer of the vast majority of the entire parcel was given the option to leave this eastern area open and unbuilt upon, in return for a transfer of increased multi-family density allowances on the western portion. The trial court, finding the City's actions to be arbitrary, unreasonable and not fairly debatable, entered final judgment for the developer. We disagree with this ruling and reverse.
The appellant City and the appellee developer have been fighting over the beach in Hollywood and the land adjoining thereto, from one end to the other, for over twenty years. This particular chapter of an apparently endless saga centers around a small strip of land comprising 92 net acres, 1 1/4 miles long from north to south, never more than 400 feet wide and named North Beach, in which the developer owns 65 acres. A north-south dedicated road (Surf Road), which is largely pedestrian and described more as a "pathway," splits the parcel and provides for vehicular parking and one way traffic. This pathway was used in the new zoning plan to separate the building pattern, resulting in the portion west of it (the D or Development Zone) being designed for residential multi-family units not to exceed 32.5 per acre. Under the same rezoning, the land to the east of the road (the C or Control Zone) was reserved exclusively for single family dwellings with a maximum of 7 density units per acre. However, the new single family area had a transfer of development rights proviso, which would permit the developer, at his option, to not build at all on the land zoned for single family residences leaving it untouched and open running east without interruption to the ocean. As a quid pro quo for this uninterrupted open area to the high water mark, the developer would have the right, after dedicating the open area to the City, to increase the density on the west side of Surf Road, so that instead of being limited to 32.5 density units per acre as before, the density would be increased to 37.4 units per acre. This transfer would result in some 368 more units being added to the D Zone while the C Zone would suffer the loss of 79 single family units.
*1334 The foregoing recitation of the facts involved in the City's plan for this North Beach area, hardly scratches the surface of any effort to completely detail the mass, or rather morass, of reports, surveys, plans, drawings, exhibits and testimony which together comprise the factual and legal basis for the city's efforts  never mind a no less bulky presentation by the developer in opposition. As a consequence, and in contrast to our norm, we will report any further factual data deemed necessary to support our legal conclusions as we continue hereunder and thus hopefully avoid sinking in a sea of factual verbiage.
The complex trial was held without a jury before one of our most deservedly venerated jurists who necessarily toiled mightily to fashion his findings and conclusions. Distilled to its essence, said judgment held as follows:
1. That the 3,000 unit density cap for the entire North Beach area "is invalid and arbitrary because the evidence is clear that it is premised upon a traffic generation rate which is patently erroneous." (We disagree.)
2. That "while the court does not per se find the subject ordinances to be confiscatory ... the evidence is clear that zoning of property located within the Control Zone to ... single family residences ... is unreasonable and arbitrary, bears no reasonable or rational relation to the public health, welfare or safety and ... is not fairly debatable." (We again disagree.)
3. That "the transfer of development rights concept as contained within this ordinance is unsupportable in fact or law." (Once again we disagree.)
4. That while "the court does not per se order [a Planned Unit Development alternative] ... nevertheless the Court can and does strongly urge . .. the utilization ... of such a flexible approach." (We do not address this particular urging.)
5. That the City "is hereby ordered to rezone ... in accordance with this judgment, those properties .. . lying within North Beach ... within six months... ." (Our conclusion here necessarily voids that direction without discussion.)
We shall address the three points in the judgment with which we must take issue.

A. THAT THE THREE THOUSAND UNIT DENSITY CAP IS INVALID AND ARBITRARY BECAUSE IT IS PREMISED ON A PATENTLY ERRONEOUS TRAFFIC STUDY.
Whether or not the City's traffic expert conducted an inaccurate traffic survey, and we do not fault the trial judge's preference for the credibility of the developer's experts to the contrary, it is completely obvious from the record that the overall density cap was predicated on a myriad of other considerations. Whether the vehicle trip generated is 10.6 vehicles a day or 6 trips was a consideration but it was not the only one by any means.
A multitude of factors was taken into consideration over and above traffic. Water and sewer capacities were measured as was the provision of services such as fire and police protection. The question of how to evacuate the residents in a hurricane with only two possible escape routes to the mainland, one at each end, was also considered concomitantly with maintenance of the dune line to protect against storm ravage. The fact that this, as the developer admitted, "is the last undeveloped beach area on the Gold Coast," is filled with desirable rare flora, is ecologically sensitive and crying out for environmental protection, is in desperate need of open space and easy public access to the ocean, were all addressed and considered in agonizing detail. Another important factor was that the area to be developed is never more than 400 feet wide from A1A to the dune line and is only 1 1/4 miles long. The placing of multi-family units in this narrow area at the former 80 units per acre density would necessitate long lines of high rise structures (which the developer's drawings depict running all the way to the ocean to the apparent exclusion of Surf Road) behind which the public would drive on A1A through another only too familiar Gold Coast sky-high concrete *1335 barrier with no sight, sound or smell of the ocean. The question of shadow on the public beach from these proposed monolithic structures was also addressed. The admitted truth is that the entire area was originally platted and earmarked for small single family dwelling lots, so that the area is now crisscrossed to A1A by some 20 paved dedicated east-west streets.[1] It is conceded that dense development would require abandonment of many of these streets which provide access to the ocean from A1A and this court cannot see how the city could be forced to abandon those rights of way and why it would not fight to retain them. Last but not least, the record shows that much thought was given to aesthetics. This court has recently held that aesthetics in and of themselves will support zoning and/or rezoning. City of Sunrise v. DCA Homes, Inc., 421 So.2d 1084 (Fla. 4th DCA 1982). Before us is the last unspoiled beach area on the Gold Coast, a veritable Shangri-La in an otherwise endless Himalayan mountain range of cement to the south. It is surely a laudable governmental purpose to restrain excessive hotel and apartment house building on it and it is neither arbitrary nor capricious to do so. This is especially so when the parcel is over a mile long and forever protected from adjoining development, to the north by John Lloyd State Park, to the east by the ocean and to the west by the inland waterway.
As we read the record and the final judgment, it is crystal clear that the traffic study became the feature of the trial which completely overpowered innumerable other salient considerations to the point of their exclusion. It is true that one of the City's experts conceded that if the vehicle trip count was too high, a lowering thereof would support increased density. However, another City expert testified that traffic counts should be viewed with a jaundiced eye. In any event, it was the City Commission, after hearings and meetings ad nauseum, not the fallacious traffic expert, which passed the ordinance. Long before this particular traffic study, the Commission had tried to adopt a 25 density unit per acre limit (over 7 1/2 less than the 32.5 allowed under the zoning now under attack). Moreover this vehicle trip count, apparently erroneous because it was predicated on a type of apartment dweller not likely to purchase in this vicinity, was also erroneous in that its estimate of the traffic saturation point was based on a four laned A1A by 1984. In fact, it appears A1A will not be four laned until the year 2000 if then. Thus, it is rational to conclude that any 75% over-estimate in the vehicle trip count must be mostly counter balanced by a 100% error in the number of available lanes. All sides concede that A1A, with no more than 500 units presently existing (most of these at the extreme north end of the strip), is presently operating between 50% to 75% capacity. A multiplication of six times that many units would, in the words of one of the developer's experts, "kill us."
We cannot conclude the subject of a unit cap without addressing this court's recent decision in City of Boca Raton v. Boca Villas Corp., 371 So.2d 154 (Fla. 4th DCA 1979), wherein we upheld the trial court's conclusion that a 40,000 unit cap for the entire city "[did] not contribute substantially to the public health, morals, safety and welfare [and was therefore] arbitrary and unreasonable." However, the facts in that Boca Raton case reveal that the cap was established by public referendum, the City planning department was never even consulted and when examined, the Boca Raton City Planning Director knew of no compelling reason for imposing this fixed limitation. In the case before us now, the City did not adopt any such Alice-in-Wonderland approach. The record is replete with comprehensive plans, studies, reports, public meetings and actual discussions with the developer over a period of years. Unlike the Boca Raton case, the City of Hollywood did not present its community purpose in the abstract, but presented a more than *1336 adequate case for the proposition that the proposed cap would contribute substantially to the public health, morals, safety and welfare of its citizens. The record also supports the proposition that the City has been attempting to accomplish a density slash since 1971 and that the developer has owned most of its holdings for fifty years. As a consequence, this was no sudden municipal zoning karate chop such as transpired in the Boca Raton case.
For all the foregoing reasons and discussions, we therefore hold that the trial judge was in error in striking down the unit cap solely because of a patent error in the vehicle trip count. We also hold that the establishment of the particular cap in this case was a proper exercise of the police power which contributed substantially to the public health, morals, safety and welfare of the citizens of Hollywood.

B. THAT WHILE THE SINGLE FAMILY ZONING WAS NOT CONFISCATORY IT WAS ARBITRARY AND UNREASONABLE.
The threshold question posed here is whether it is contradictory to maintain that the ordinance is not confiscatory yet is unreasonable and arbitrary. We hold it is not.
When reviewing a zoning ordinance, the trial court must determine whether it is confiscatory or merely unreasonable and arbitrary. Broward County v. Capeletti Bros., 375 So.2d 313 (Fla. 4th DCA 1979). A zoning ordinance will be deemed confiscatory if it effectively deprives a property owner of the beneficial use of his property by precluding any reasonable use of it. An ordinance is confiscatory when all reasonable uses are prohibited. S.A. Healy Co. v. Town of Highland Beach, 355 So.2d 813 (Fla. 4th DCA 1978). Anderson, American Law of Zoning Second § 3.26 (1976). On the other hand, to determine if a zoning ordinance is unreasonable and arbitrary, the litigant must prove that the ordinance has no rational relationship to the public health, morals, safety or general welfare, is not reasonably designed to correct a condition adversely affecting the public good and is not even fairly debatable. Broward County v. Capeletti Bros.; see City of Miami v. Kayfetz, 92 So.2d 798 (Fla. 1957); 101A C.J.S. Zoning & Land Planning § 25 (1979). We conclude that there is a difference and no paradox is presented.
Needless to say, the question of whether the restriction to single family housing in the C Zone was reasonable and not arbitrary became a typical battle of experts each presumably paid to put their respective clients' best foot forward.
There is, however, an important omission by both sides. Except for the most northerly 1/4 mile, the entire parcel on either side of the Surf Road pathway for about a mile has, so far as we can see from the aerial map, only about 15 small structures on it, some of them apparently single family houses. We are told that no development is possible west of A1A. Therefore, we have a mile of undeveloped ocean front, bounded on the east by the sparkling waters of the Atlantic, on the west by the inland waterway and on the north, by John Lloyd State Park. Thus, it is obvious that the C Zone and D Zone taken together would have been more than suitable for single family zoning throughout and in fact were originally platted for such. Single family zoning for the approximately 54 net acres owned by the developer in the D Zone would result in about 7 units per acre on 5800 square foot lots (the size of lots platted) whereas the developer, under the new zoning as adopted, achieved 32.5 units per acre (or as much as 37.4 units per acre if the transfer rights were exercised). It would appear, therefore, that the developer came out of this rezoning much better than he might have and certainly was not treated arbitrarily or capriciously. No one can argue that mere economic loss would preclude the rezoning of the entire tract to single family zoning. Mayflower Property, Inc. v. Watson, 233 So.2d 390 (Fla. 1970), and S.A. Healy Co. v. Town of Highland Beach, supra.
We are also unimpressed with the testimony of the experts, quoted by the trial *1337 judge, stating that single family zoning adjacent to the beach with multi-family to the west does not exist anywhere in South Florida. We could recite several instances to the contrary from personal knowledge, but contenting ourselves to remain judiciously within the four corners of the Southern Reporter we refer to S.A. Healy Co. v. Town of Highland Beach, supra, where the same problem exists and where single family zoning was upheld.
Turning to the specifics of the C Zone east of the Surf Road pathway, it would be totally inconsistent to find that the entire parcel from A1A to the ocean is compatible with single family zoning, but that the most desirable portion of that parcel right next to the ocean is not. Moreover, the trial judge expressly found that the single family restriction was not confiscatory, so it follows that all reasonable use of it is not precluded. This being so, we must look to see if the ordinance bears a rational relationship to the public health, morals, safety or general welfare and is reasonably designed to correct a condition adversely affecting the public good. A restriction placed on the ocean's edge which limits high-rise construction, preserves open space, cuts down on shadow and reduces densities to 7 units per acre in order to achieve its ends, is most definitely in the public good for the many reasons which have already been discussed in other parts of this opinion. We also flatly reject the experts' conclusion, adopted by the trial judge, that people will not live in a single family dwelling near a public beach. Not only are all of our beaches public below the high water mark, but examples to the contrary are legion and we take judicial notice of them.
All in all, while we are mindful of Judge Downey's admonition that an ordinance does not become fairly debatable merely because the city's expert disagrees with the developer's expert whom the trial judge prefers (see Boca Raton case supra at 159), we nonetheless hold that the application of this particular zoning classification to this specific parcel of property in the C Zone is compatible, fairly debatable and should not have been disturbed by the trial court. See Davis v. Sails, 318 So.2d 214 at 217 (Fla. 1st DCA 1975). See also Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

C. THAT THE TRANSFER OF DEVELOPMENT RIGHTS PROVISION OF THE ORDINANCE WAS UNSUPPORTABLE IN FACT OR LAW.
The concept of transfer of development rights (TDR) is a relatively new technique employed in land use regulation and as yet there is little case law nationally on the subject and none is cited to us from Florida although we have ourselves uncovered a statute not cited in the briefs which leaves us nothing short of mystified. See Section 193.501, Florida Statutes (1981). Basically, a TDR allows that development rights, attributable to one piece of land, be transferred to another. Summarizing from James H. Foster's article, The Transferability of Development Rights, 53 U.Colo.L.Rev. 165 (1981), a TDR plan provides a third alternative to either buying the land sought to be preserved (which most municipalities cannot afford) or simply abandoning any attempt to preserve ecologically sensitive areas. This third alternative consists of offering a developer "fair compensation" in the form of increased development rights on other land in return for land use restrictions on the land sought to be preserved.
As many authors have recorded, there are many arguments pro and con to this TDR concept.[2] However, under the limited facts of the case now before us, we have no *1338 trouble upholding the particular provision employed, especially in view of our other holdings herein. The seminal case appears to be Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), wherein the court stated three major factors that are taken into account in assessing whether or not a taking has occurred: (1) the character of the government action involved, (2) whether the land use restriction on real property may be held to constitute a taking if it is not reasonably related to a valid public purpose, and (3) the economic impact of the regulation on the claimant.
Applying these three criteria to the case at hand, we have already found the government action to be proper and reasonably related to a valid public purpose. As to the economic impact of the transfer, it involves the loss of the right to build 79 single family units vis-a-vis the gain of 368 more multi-family units on adjoining land, both parcels already owned by the developer. We cannot quarrel with the economics of that exchange especially when the value of all the multi-family units will be enhanced because the buildings will have an uninterrupted ocean-front position and view.
One of the developer's main objections to this particular TDR is that it requires a dedication of the beach front by deed. As the developer sees it, this actual transfer of title goes too far and is without parallel in the case law. However, we cannot see why an actual conveyance should prove fatal unless the preservation of the open space is somehow only temporary. To us, the quid pro quo is what should control. If the developer takes advantage of the increased density transferred and builds accordingly, does that not mean the preservation of the open space is forever? We certainly hope so and are suspicious of any motives for keeping a hold on it. Besides, the developer is not required to effect the transfer in this case and may instead elect to build single family residences. The developer argues that this is not really optional and is, in practical result, mandatory. We have already held that single family zoning is compatible with this ocean strip, but even if we had not, we do not find this particular TDR offensive. To be sure, to permit 368 units more to the west in return for open space to the east, smacks of carrot-and-stick. Yet in this age of site plans impact studies, impact fees, PUDs, land use plans and required approvals, developers and government play carrot-and-stick with each other all the time. In other words, the game is the same, they have simply changed the name. Accordingly, we reverse the trial judge's holding that the provision is unsupportable in fact or law.
We find no merit in the remaining points on appeal.
REVERSED AND REMANDED WITH DIRECTIONS TO ENTER FINAL JUDGMENT IN ACCORDANCE HEREWITH.
HURLEY and DELL, JJ., concur.
NOTES
[1] The single family zoning was changed in 1953 to multi-family which, prior to the present ordinance, permitted 80 dwelling units per acre.
[2] Carmichael, Transferable Development Rights as a Basis for Land Use Control, 2 Fla. St.U.L.Rev. 35 (1974); Rose, Transfer of Development Rights: A Preview of an Evolving Concept, 3 Real Estate L.J. 331 (Spring 1975); Spagna, Transfer of Development Rights: The Collier County Experience, 6 Fla. Environmental & Urban Issues 7 (1979); 2 Juergensmey & Wadley, Florida Land Use Restrictions § 18.09 (1980); Foster, Transferability of Development Rights, 53 U.Colo.L.Rev. 165 (1981) and note, The Unconstitutionality of Transferable Development Rights, 84 Yale 1101 (1975).