## SLOAN, et al. v ST. LUCIE COUNTY EXPRESSWAY and WALTERS, et al. v ST. LUCIE COUNTY EXPRESSWAY

### Case Nos. 87-2279 and 87-2517

State of Florida, Division of Administrative Hearings

December 2, 1987

### APPEARANCES OF COUNSEL

**John T. Brennan** for petitioners.

**Frank J. Lynch, Jr.** for respondent.

### OPINION OF THE COURT

W. MATTHEW STEVENSON, Hearing Officer.

### RECOMMENDED ORDER

Pursuant to notice, the Division of Administrative Hearings, by its duly designated Hearing Officer, W. Matthew Stevenson, conducted a formal hearing in this cause on September 30, 1987, in Ft. Pierce, Florida.

## PROCEDURAL BACKGROUND

By Petition for Administrative Hearing filed on May 18, 1987, Petitioners T. L. Sloan, James Taylor and Bill Stewart (DOAH Case No. 87-2279) alleged that they were the owners of property directly and adversely affected by right-of-way reservation maps filed by the Respondent, St. Lucie County Expressway Authority, prohibiting the issuance of permits and further development of said property. By Petition for Administrative Hearing filed on May 26, 1987, Petitioners M. C. Walters and D. J. Gonzalez also alleged that they were the owners of property directly and adversely affected by the right-of-way reservation maps filed by the Respondent. (DOAH Case No. 87-2517). Pursuant to Section 337.241, *Florida Statutes,* the Petitioners requested a formal administrative hearing in accordance with the provisions of Section 120.57(1), *Florida Statutes.* Both cases were consolidated for purposes of the final hearing.

At the final hearing, the Petitioners presented the testimony of John G. Ament, Community Development Director for St. Lucie County; David Fuller, accepted as an expert in the field of property appraisals; Diane Robertson, manager of T. L. Sloan's investment properties; and, Petitioners Mark Walters and James Taylor. Petitioner's Exhibits 1 through 5 were duly offered and admitted into evidence. The Respondent presented the testimony of Timothy Davis, accepted as an expert in the field of property appraisals; Phillip Gerlach, Jr., the civil engineer in charge of the design of the St. Lucie County East-West Expressway; and, Larry K. O'Dell, Executive Director of the St. Lucie County Expressway Authority. In addition, Respondent's Exhibits 1 through 3 were duly offered and admitted into evidence. The parties have submitted post-hearing Proposed Findings of Fact. A ruling has been made on each proposed finding of fact in the Appendix to this Recommended Order.

## FINDINGS OF FACT

Based upon my observation of the witnesses and their demeanor while testifying, the documentary evidence received and the entire record compiled herein, I hereby make the following Findings of Fact:

1. The Respondent, St. Lucie County Expressway Authority, was created by the Florida legislature in 1983, and is governed by Chapter 348, *Florida Statutes.* The Authority is composed of two members from the Board of County Commissioners of St. Lucie County, two members from the City Commission of Ft. Pierce, two members from the City Council of Port St. Lucie and three members appointed by the governor.

2. Based on the anticipated future growth of St. Lucie County, there is a need for additional East-West traffic arteries in the southern portion of the county to ease expected traffic conditions. The St. Lucie County Expressway Authority employed consultants and conducted public hearings to determine the best location for such a roadway.

3. Prior to selecting the location for the proposed East-West Expressway, the St. Lucie County Expressway Authority examined feasibility studies, traffic count reports and engineering and road design proposals on alternative alignments and found the proposed corridor to be the best choice from both an economic and environmental standpoint.

4. The proposed expressway route connects Interstate 95 to U. S. Highway 1. Phase 1 of the project would begin in the southern portion of St. Lucie County at U. S. Highway 1 and continue east, following existing transmissions lines owned by Florida Power and Light Company and extend to a point which is now called East Torino Parkway. The total length of Phase One of the project is approximately 2.6 miles. Phase Two would extend the project to Interstate 95.

5. The St. Lucie County Expressway Authority expects to obtain funding for construction of the East-West Expressway from various sources including the State of Florida's Toll Facilities Revolving Trust Fund, the Florida Department of Transportation and state-backed revenue bonds. The use of state-backed revenue bonds would require St. Lucie County to pledge a certain portion of its gas tax revenue as security to cover the bonds in the event that the expressway did not generate enough money from tolls to pay back the bonds. A public hearing is scheduled for January, 1988 at which the St. Lucie County Commission will review updated feasibility studies and traffic count estimates to determine whether the pledge the necessary funds to support the bonds.

6. Assuming that approval is obtained for state-backed revenue bonds, the letting of a contract to construct the East-West Expressway could be accomplished by July 1, 1989. The time period for construction of a project such as the East-West Expressway is approximately two (2) years from the date that the contract for construction is executed. Thus, under the most optimistic outlook and projections, the proposed East-West Expressway could be completed by July of 1991. However, difficulties in obtaining funding and/or necessary environmental permits could delay completion of the expressway for ten (10) years, or until 1997.

7. In conjunction with the preparation of plans for construction of the East-West Expressway, the St. Lucie County Expressway Authority

254

filed "right-of-way reservation maps" on October 13, 1986, in accordance with Section 337.241, *Florida Statutes.* The reservation maps were filed and approved b the St. Lucie County Expressway Authority in compliance with all applicable statutes and regulations.

8. The purpose of filing the right-of-way reservation maps by the St. Lucie County Expressway Authority is to preclude development of properties within the proposed corridor of the East-West Expressway while final construction and engineering plans are being prepared, thereby prevent an increase in cost of acquisition of those properties pending eventual eminent domain proceedings.

9. The right-of-way reservation maps will prohibit the granting of development permits, as defined in Section 380.031(4), *Florida Statutes,* by any governmental entity for a period of five (5) years from the date of recording of the reservation maps. This period may be extended for an additional five years at the option of the Expressway Authority pursuant to Section 337.241(2), *Florida Statutes.* The reservation maps do not prohibit sale, continued use of the property by its owners nor is any use prohibited which does not require a development permit as defined in Section 380.031(4), *Florida Statutes.*

10. The engineering construction plans for the East-West Expressway encompass less area than the reservation maps. However, the larger reserved area will be utilized to facilitate construction of the project and for water retention on site. Thus, less private property will ultimately be taken than that which is included in the right-of-way reservation area.

11. The property owned by Petitioners, T. L. Sloan, James Taylor and Bill Stewart (hereinafter referred to as the "Sloan property") consists of a front and rear parcel. The front parcel consists of 6.54 acres of which 2.28 are within the right-of-way reservation area. The rear parcel is physically separate from the front parcel by a drainage canal and consists of approximately 4.25 acres. The rear parcel is not within the reservation map area, but access to this parcel can only be gained by U. S. Highway 1 through the front property.

12. The property owned by Petitioners Mark C. Walters and David J. Gonzalez (hereinafter referred to as the "Walters' property") measures approximately 55,450 square feet of which approximately 46,000 square feet are within the right-of-way reservation area.

13. The Sloan and Walters' properties are located at the easternmost end of the proposed East-West Expressway and front the east side of U.S. Highway 1 in Ft. Pierce, Florida. Both properties were purchased

**255**

in 1984 as investment property and are presently vacant, unimproved acreage.

14. The front parcel of the Sloan property is zoned commercial general and the rear parcel is zoned multi-family residential at five units per acre. The Walters' property is zoned commercial general and is adjacent to the Florida Power and Light transmission lines.

15. The St. Lucie County Expressway Authority intends to use the property within the reserved area for the construction of the entrance and exit ramps of the proposed expressway. The engineering design of the East-West Expressway was done with as little intrusion upon Petitioner]s properties as practical and only that property absolutely necessary for construction will ultimately be taken.

16. Pursuant to the right-of-way reservation maps, all of the highway frontage on U. S. Highway 1 for both properties has been reserved for the expressway construction. Because of existing regulations, the St. Lucie County zoning office will not issue any development permits for property which has no access to a public highway. Therefore, the local zoning office will not issue any development permits for any portion of the Petitioners' properties, whether included in the reservation area or not. Thus, all of the property owned by the Petitioners has been affected by the right-of-way reservation maps.

17. The Sloan property was listed for sale prior to the recording of the right-of-way reservation maps. The Walters' property was purchased with the intent to build a gun shop which is now operated by the present owners at another location. After the recording of the reservation maps, the Walters' property was actively listed for sale.

18. After the recording of the reservation maps, purchase inquiries regarding the Sloan property began to rapidly decrease. Inquiries regarding the Walters' property have also been extremely slow. No written offers to purchase the subject properties have been submitted to any of the Petitioners.

19. David Fuller, a real property appraiser called as a witness by Petitioners, prepared an appraisal estimating the effects of recording the right-of-way reservation maps on the Sloan and Walters' property. The testimony of Mr. Fuller is accepted as more credible and pertinent to the issues involved in this cause than the testimony presented by Mr. Davis, the Respondent's expert appraiser. Mr. Davis admitted that the purpose of his appraisal was to estimate the fair market value of the property in fee simple, the part "taken" and damages to the remainder for the purpose of eminent domain. Mr. Davis' analysis is more appropriate for an action sounding in eminent domain.

20. Mr. Fuller used the Sales Comparison or Market Approach combined with a discounted cash flow method of appraisal in determining the difference in the value of the properties before the recording of the right-of-way reservation maps, and the market value of the properties immediately after recording of the reservation maps.

21. The value of real property is directly related to the use to which it can be put. Thus, a particular parcel may have several different value levels under alternative uses. In determining what, if any, substantial impact the record of the right-of-way reservation maps had on the market value of the Sloan and Walters' property, Fuller evaluated the difference in the value of the properties utilizing their highest and best use before the filing of the right-of-way reservation maps and the highest and best use after the recording of the maps.

22. The highest and best use for the Sloan property without the encumbrance of the right-of-way maps would be to improve the front commercial zoned parcel with a commercial use consistent with neighborhood use trends (i.e., strip shopping centers, rental storage buildings and/or automobile dealerships) and improve the rear multi-family zoned parcel with a support use for the front commercial property.

23. The highest and best use of the Sloan property after filing of the right-of-way reservation maps would be to hold the property as vacant until the right-of-way reservation map filing expires. Although the Sloan property could be sold within the right-of-way reservation, a majority of the potential market would be eliminated and the remaining market would require a discount to purchase the property knowing that the restrictions exist. The potential market in the neighborhood consists of generally three types of investors: (1) the owner occupant; (2) the real estate investor seeking income from an improved property; and (3), the short term land speculator. The owner occupant seeking to immediately build would not consider the property in question because the potential to immediately construct a new improvement is not available. Likewise, the investor seeking to build an income producing improvement, either immediately or in the next threeyears, would not be interested in the property. The short term land speculator would not be interested because there is no certainty that the property would be able to be developed to its highest potential market value within the next two to three years.

24. The highest and best use for the Walters' property without the encumbrance of the right-of-way reservation maps would be to improve the parcel in approximately one to two years with a commercial use consistent with the neighborhood trends (i.e., owner occupied small

**257**

business and/or mini-storage property). Improved uses such as an automobile dealership or shopping center could not be physically constructed on a site the size and shape of the Walters' property.

25. The highest and best use of the Walters' property after filing of the right-of-way reservation maps would be to hold the parcel vacant until the reservation filing expires. As with the Sloan property, although the parcel could be sold, a majority of the potential market would be eliminated and the remaining market would require a discount to purchase the property knowing that the restrictions exist.

26. Mr. Fuller stated that in his opinion, using the discounted cash flow model of appraisal, the Sloan properties suffered a total loss in value of approximately $441,450.00 on the date the reservation maps were filed. As to the Walters' property, the loss was calculated at $78,480.00. Mr. Fuller's financial calculations as to loss are misleading and not very useful because they were specifically calculated for a period of time of ten years. In other words, Mr. Fuller's total loss of value calculations are based on the assumption that the reservation map restrictions would exist for the full initial five (5) year period and that they would be extended for an additional five (5) year period.

27. The ability to develop vacant and unimproved commercial property and to put the land to its highest and best use is a substantial beneficial ownership interest arising out of the ownership of commercial property. Both of the properties owned by Petitioners are fully capable of development and no other impediments to development exist except for the reservation maps. Substantial payments on the mortgages for the properties are being made by Petitioners each year totalling over $58,000.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the parties to, and subject matter of, these proceedings. Section 120.57(1), *Florida Statutes.*

2. Pursuant to Section 337.241, *Florida Statutes,* the St. Lucie County Expressway Authority has the authority to acquire rights-of-way and may prepare and record maps of reservation for any road within its jurisdiction. Any such reservation maps may delineate the limits of proposed rights-of-way for the eventual widening of an existing road or for the initial construction of a road. After a public hearing, the reservation maps are sent to the Clerk of the Court of the affected county, where they are recorded in the public land records.

3. Section 337.241(2)(b), *Florida Statutes,* provides as follows:

(2) Upon recording, such map shall establish:

. . . . . . . . . . .

(b) an area of proposed road construction within which permits, as defined in § 380.031(4), Florida Statutes shall not be issued for a period of five (5) years from the date of recording such map. The five (5) year period may be extended for an additional five (5) year period by the same procedures set forth in subsection (1).

4. Section 337.241(3), *Florida Statutes* provides as follows:

Upon petition by an affected property owner alleging that such property regulation is unreasonable or arbitrary and that its effect is to deny a substantial portion of the beneficial use of such property, the Department or Expressway Authority shall hold an Administrative Hearing in accordance with the provisions of Chapter 120. When such a hearing results in an order finding in favor of the petitioning property owner, the Department or the Expressway Authority shall have 180 days from the date of such order to acquire such property or file appropriate proceedings. Upon failure by the Department or Expressway Authority to acquire such property or initiate acquisition proceedings, the appropriate local governmental entity may issue any permit in accordance withits established procedures.

5. The order issued by the Hearing Officer in a hearing held pursuant to Section 337.241, *Florida Statutes* and Section 120.57(1), *Florida Statutes* is a Recommended Order and the Department of Transportation or the appropriate expressway authority shall issue the final order. See, *Joint Ventures, Inc. v. Department of Transportation,* Final Order filed by the Department of Transporation July 21,1986, Case No. 86-0285. There, the Hearing Officer held that the nature of the order rendered by the Division of Administrative Hearings under Section 337.241(3), *Florida Statues* was a Final Order. When the unsuccessful property owner attempted to appeal the order to the First District Court of Appeal in Case No. BN-310, the case was held in abeyance by the court while jurisdiction was reqlinquished to the Department of Transportation for entry of a Final Order.

6. Despite the allegations contained in the initial petition for formal hearing filed by Petitioners, the constitutionality of the subject statute is not within the jurisdiction of an administrative proceeding. Neither are some of the other allegations of the petition, such as the claim of inverse condemnation and request for compensation. Further, the Petitioners have failed to establish any legal basis to support their request for attorneys fees in these proceedings. The Petitioner's request

for attorneys fees is denied without prejudice to be raised in any subsequent proceedings where appropriate.

7. In the instant case, the burden of proof is on Petitioner to show, by a preponderance of the evidence, that the action of the St. Lucie County Expressway Authority in filing the maps of reservation "is unreasonable or arbitrary and that its effect is to deny a substantial portion of the beneficial use of such property."

8. Thus, the Petitioners' burden is two-fold and they must prove both: (1) that the regulation is unreasonable or arbitrary; and (2) that its effect is to deny a substantial portion of the beneficial use of the property.

9. The Respondent argues that the property regulation in question is reasonable and not arbitrary because the regulation has a rational relationship to public health, morals, safety or general welfare and was enacted within the proper police power of the State, citing *City of Hollywood v. Hollywood, Inc.,* 432 So.2d 1332 (Fla. 4th DCA 1983). Accordingly, under the Respondent's view, as long as the regulation has the appropriate relationship to the public health, morales, safety or general welfare, a landowner may not and cannot be entitled to relief under Section 337.241, *Florida Statutes,* even if the landowner proves that the effect of the regulation is to deny a substantial portion of the beneficial use of the property.

10. The Petitioner argues that when a land development restriction amounts to a taking, and is confiscatory, it cannot be deemed reasonable, citing *Key Haven Associated Enterprises, Inc. v. Board of Trustees of The Internal Improvement Fund,* 427 So.2d 153 (Fla. 1982). According to Petitioner, the issue of reasonableness in the context of Section 337.241, *Florida Statutes* has nothing to do with proving that the property regulation in question has no rational relationship to the public health, morals, safety or general welfare. The Petitioners' assert that the reservation maps recorded by the St. Lucie County Expressway Authority are confiscatory, amount to a taking of such property and are, therefore, unreasonable.

11. Section 337.241, *Florida Statutes* was designed to be applied in an administrative setting. An administrative tribunal has no authority to decide the constitutionality of a statutory scheme. The determination of whether a property regulation has a rational relationship to the police power of the State is largely a constitutional question. Likewise, the authority to decide whether a property regulation is confiscatory within the context of eminent domain or inverse condemnation principles is a matter for the courts of law. See *Pennsylvania Coal v. Mahon,*

260 U.S. 413 (1926); *Key Haven Associated Enterprises v. Board of Trustees of The Internal Improvement Trust Fund,* 427 So.2d 153 (Fla. 1982); *Graham v. Estuary Properties, Inc.,* 399 So.2d 1374 (Fla. 1980). Such issues are not within the jurisdiction of this tribunal to consider.

12. Therefore, it is concluded that the legislature did not intend for the administrative determination of "reasonableness" of the property regulation to include the constitutional question of validity of the exercise of police power nor the question of whether the regulation is confiscatory and amounts to a taking according to the principles of eminent domain law. Rather, this administrative tribunal must examine the scope of the property regulation and its effect on the property in question to determine whether or not the regulation is "reasonable" or "arbitrary" within the plain meaning of those words and in view of the remedial purposes of the statute. Of course, it would not be inappropriate to consider the reasoning contained in cases addressing similar issues from a constitutional viewpoint involving eminent domain and condemnation cases.

13. In the instant case, the maps of reservation filed by the St. Lucie County Expressway Authority affect all of the Petitioners' property because all of the highway frontage on U. S. Highway 1 for both properties has been reserved for the expressway construction. Because there is no access to a public highway, the St. Lucie County zoning office will not issue any permits for any portion of Petitioners' properties. Thus, property located within and without the outline of the reservation maps is affected. The Petitioners are left with no reasonable use of any portion of their lands except to allow them to remain vacant. Therefore, as applied to Petitioners' property, the encumbrances of the reservation maps are unreasonable. It would be a far different story if the Petitioners' land was presently developed and the Petitioners were merely seeking to upgrade the development in order to place the land at its highest and best use or were seeking to dedicate the land to a different and a more profitable use.

14. The reservation maps clearly deny Petitioners a substantial portion of the beneficial use of their property. The evidence was uncontroverted that the ability to develop the land is a substantial beneficial ownership interest arising out of the ownership of vacant and unimproved commercial property. The evidence was equally clear that the Petitioners are not merely "opportunists" seeking to take advantage of the situation and reap a windfall benefit because of the anticipated construction of a public highway. Substantial payments on the mortgages for the properties are being made by Petitioners each totalling over $58,000.

15. The Petitioners have established that the property regulation in question is unreasonable as applied to their property and that its effect is to deny a substantial portion of the beneficial use of such property.

## RECOMMENDATIONS

Based on the foregoing Findings of Fact and Conclusions of Law, it is,

RECOMMENDED that the St. Lucie County Expressway Authority enter a Final Order in favor of Petitioners after which the Authority shall have 180 days from the date of said order to acquire the Petitioners property or initiate appropriate acquisition proceedings pursuant to the requirements of Section 337.241, *Florida Statutes.*

DONE and ORDERED this 2nd day of December, 1987 in Tallahassee, Leon County, Florida.